Dennis Roy BUTLER, Appellant,

v.

The STATE of Texas, Appellee.

No. 741–84.

Court of Criminal Appeals of Texas, En Banc.

March 19, 1986.

Louis T. Rosenberg, Donald E. Barnhill, San Antonio, for appellant.

Arthur C. Eads, Dist. Atty. and James T. Russell, Asst. Dist. Atty., Belton, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

CLINTON, Judge.

Appellant was convicted of the first degree felony offense of aggravated robbery. V.T.C.A. Penal Code, § 29.03. The jury assessed his punishment at seven years confinement. In an unpublished opinion the Third Court of Appeals found that appellant had received ineffective assistance from his retained counsel and accordingly reversed the conviction. *Butler v. State*, No. 3–83–133–CR (Tex.App.—Austin, delivered May 9, 1984). Less than one week later, the United States Supreme Court delivered its opinion in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) [hereafter *Strickland*]. We granted review to determine whether the standard of effective assistance of counsel established by *Strickland* requires reversal of the court of appeals' opinion.

I.

The offense occurred at approximately 7:45 a.m. on a Saturday morning, May 8, 1982, in Killeen. The victim of the robbery was Ms. Wanda Vilhauer, the assistant manager of a convenience store, Mickey's. She was alone in the store that morning when a black man entered, walked around the store, asked a question or two, and then approached Vilhauer with what she took to be a gun, though there was later some question of that. After handing over approximately two hundred dollars in cash, Vilhauer was instructed to lie face down on the floor. She testified that she was in fear for her life. While she lay there the robber fled. Vilhauer testified that she tried calling the police, could not get an operator, and instead called Jane Goen, who managed the washateria adjacent to the convenience store. The police were called and arrived a few minutes later.

Officer Kenneth Olson of the Killeen Police Department arrived at the store at 8:03, by his estimation. He began interviewing potential witnesses, including Vilhauer, Goen, and Army Sgt. John Williams, who had been sitting outside the store at

the time of the robbery and had seen a black man fleeing on foot afterwards.

Answering a radio call to serve as back-up was Officer Kenneth Edmiston. After being given a description of the robber and the information that he had fled on foot toward a nearby residential area Officer Edmiston drove through that area but found no suspects. Giving up the search, he parked and began using a radar unit to clock the speed of passing vehicles. At approximately 8:20 he observed a car going 43 miles per hour in a 30 miles per hour zone, and followed the car into a McDonald's parking lot. Officer Edmiston observed that the driver was a black man who "fit the description somewhat" of the robbery suspect. The officer patted down the driver and found no weapons. The driver was very cooperative, according to the officer's testimony. He identified himself as Dennis Butler, a 22 year old Army officer stationed at nearby Fort Hood. After issuing a citation for speeding, the officer released Lt. Butler [hereafter appellant].

Subsequently the complainant identified appellant in a photo lineup as the man who had robbed her. Appellant was arrested. Some time later in a corporeal lineup the complainant again identified him.

Appellant raised defenses of misidentification and alibi. The main discrepancy between the complainant's description of the robber and appellant's appearance was height. The complainant had told the investigating officer that the robber had been approximately 5'7" or 5'8". Appellant is 6'2". At trial, however, the complainant testified that appellant looked about 5'8" to her.

Appellant testified in his own behalf. He said he did not rob the complainant, but was a frequent customer of the convenience store because it was the closest one to his home, and he had in fact gone in the store later the day of the robbery. The complaining witness had waited on him several times in the past. (Vilhauer had testified she remembered appellant as a customer of the store before the robbery but

that he came in "very seldom... like once in a great while." Appellant testified he patronized the store at least four times a week.)

Appellant testified he was at home at the time of the robbery. He lived in an apartment near the scene of the robbery with another Army officer, Lt. Roger Sims, and Sims' wife. Appellant testified he had been up early that morning but had not left the apartment until 8:15 or so, half an hour after the approximate time of the robbery. He had been on his way to McDonald's for breakfast when he was given the speeding citation by Officer Edmiston. Appellant further testified that before leaving his apartment he had called his sister in Wichita Falls. This call took place a very few minutes after the time of the robbery.

Lt. Sims testified for the defense. He remembered the day in question as a Sunday rather than a Saturday, and said he had been up early because he was the duty officer that day. He had talked to appellant shortly before he left the apartment at 8:15. Lt. Sims was sure he would have heard appellant leave the apartment before that time if he had. The witness also remembered appellant calling his sister that morning.

Lt. Sims testified further that appellant had no need of extra money, that he had recently made a loan to Lt. Sims and that a tax refund check of almost five hundred dollars had come in the mail for appellant the day before the robbery.

Mrs. Sims did not testify. On crossexamination appellant was asked by the prosecutor if Mrs. Sims had been in the apartment that morning and appellant responded that she had been.

In closing argument defense counsel pointed out that appellant was on the phone very near the time of the robbery. He told the jury, "I don't think there's any dispute that he made a phone call to his sister that day." While it may not have been disputed in the evidence, neither was it corroborated. Cognizant of this, the

State in its argument pointed out the evidence appellant had *not* presented:

"You didn't hear from Lt. Sim's [sic] wife who could have said that's right, Dennis Butler was there all that morning until he left to go play basketball. You didn't hear from Dennis Butler's sister who could have come down here from Wichita Falls and very easily said, I talked to him that morning at 7:45 and he didn't hang up until 8:05. You didn't hear that. You didn't hear somebody come in and say I work for the telephone company and these are our long distance toll records and we show a call from Lt. Sims [sic] number to somebody in Wichita Falls at such and such time on the morning of the 8th of May . . . And you didn't hear somebody from the bank, wherever it is, that Mr. Butler had $240 in it come in and say we checked our bank records and that's right, that's what he had in . the bank. So every bit of the alibi comes not from Sims, not from Sims' wife, not from Butler's sister, but from the Defendant himself."

Appellant was convicted by the jury.

The court of appeals relied on decisions of this Court to find that appellant's trial counsel had been ineffective and thus to reverse appellant's conviction. The evidence concerning the effectiveness of trial counsel's representation was developed at a motion for new trial hearing held the month following appellant's trial.

Appellant complained that his counsel had not (1) sought out and interviewed potential witnesses; (2) called Mrs. Sims in support of appellant's alibi defense; or (3) introduced available evidence of appellant's bank balance and phone call to his sister.

Two witnesses testified at the motion for new trial hearing that appellant was not the man who robbed the complainant. The first was John Williams, the Army sergeant who testified that he had bought a magazine in the store and then had waited outside to meet his girl friend. He testified that a black man had walked past and spoken to him, gone into the store for a few minutes, and then again walked past Williams. A minute later Vilhauer had come out shouting that she had been robbed. Williams testified that appellant was not the man he had seen. He identified the man as one Willie Williams (no relation), whose name he had not known at the time of the robbery but had subsequently learned.

Jane Goen, the manager of the washateria adjacent to the convenience store, also testified at the hearing that she had seen the man who had robbed the complainant. She had come running from the washateria in time to see him walking away, she said. Goen testified that appellant was not the man. She identified the same Willie Williams, a customer of her washateria, as the robber.

Goen had witnessed the same lineup at which Vilhauer, the complaining witness, had identified appellant, though the two witnesses had separate viewings. Goen failed to identify appellant as the robber and had said in fact that the man she had seen was perhaps not in the lineup. She had scrutinized appellant and one other man in the lineup more closely, but had concluded that she couldn't pick the robber out of that group.

Goen did not remember appellant's trial counsel talking to her the day of the lineup. He only talked to her briefly in the hallway of the courtroom the day of appellant's trial more than six months after the lineup. According to the witness, she told counsel at that time that appellant was not the robber. Goen was not, however, called as a witness by either the State or defense.

Mrs. Sims, the third occupant of the apartment where appellant lived at the time of the offense, also testified at the hearing. She was more certain than her husband that appellant had been in the apartment at the time of the offense. She was up by seven o'clock that morning getting ready for work, and had heard appellant moving around and singing. Soon after that she saw him, dressed to play basketball. She last saw him, talking to her husband, when she left for work at 7:50.

Mrs. Sims knew of no reason she could not have testified at appellant's trial, but she had not been called as a witness. She had never spoken to appellant's lawyer.

Appellant testified at the motion for new trial hearing that he had told his lawyer Mrs. Sims was in the apartment at the time necessary to his alibi defense. Appellant said that after the verdict of guilty he asked his lawyer why he had not called Loraine Sims as a witness, but received no reply.

Appellant had obtained before trial the phone bill showing that a call had been made from his phone number to his sister's in Wichita Falls, from 8:01 to 8:09 the morning of the robbery. He had informed his lawyer that his sister would also testify to that effect. He had also obtained a bank statement showing his deposit of his income tax refund, and his balance of more than $200 at the time of the robbery. These were the items of evidence lack of which the State had commented on at the close of its argument to the jury. Defense counsel had not introduced the records or called appellant's sister as a witness at trial.

Lon Curtis, the assistant district attorney who had represented the State at appellant's trial, was called as a defense witness at the hearing. He testified that he and defense counsel had informally arranged pretrial discovery. Curtis had informed defense counsel of the potential witnesses Goen, John Williams, and a man named Freddie Shipp. Curtis had also told counsel, however, that Williams and Shipp had told the investigating officers they could not identify the robber.

At the time he was retained on appellant's case, appellant's trial counsel, William Looney, had working for him a recently licensed attorney named Amy Flynn. Flynn testified at the hearing that she had done some preliminary interviewing of appellant and Lt. Sims. She had been aware that Mrs. Sims was also in the apartment, and also knew about the bill for the phone call to appellant's sister. Flynn rarely worked on criminal cases, she said, and in fact had not been assigned by defense counsel to handle this case. By the time of the trial Flynn was no longer working for Looney. One reason for her departure was that she was "thoroughly convinced that Mr. Butler was innocent and I was not sure whether or not we were going to be able to prove that and so it was a very—it was a very difficult situation."

When the State presented its case in the motion for new trial hearing appellant was again called as a witness. Counsel for the State suggested that appellant's trial counsel had told appellant that Goen, the washateria manager, had said the day of trial that "you were the person that she saw at that store except the heighth [sic]" and that therefore appellant had agreed with his lawyer that she should not be called as a witness. Appellant acknowledged that had been the case. On crossexamination he said that he had never spoken to Goen himself. He had relied on his lawyer to prepare for trial.

William Looney, appellant's trial counsel, was called as a witness by both the defense and the State. He testified that he had worked out discovery informally with the assistant district attorney. He had been informed of the height discrepancy in the complaining witness's description, but had also been told that she was a poor judge of height. Looney asked for the lineup himself, hoping Vilhauer would fail to identify appellant. The prosecutor had let Looney choose the other participants in the lineup himself. Looney passed this responsibility on to appellant, asking him to provide four other men of approximately appellant's height and build. He knew appellant played on a basketball team at Fort Hood, and so could find qualified candidates. Looney did not meet the men to judge their appearance until immediately before the lineup. He hoped Vilhauer would fail to identify appellant because of her description of the robber's height. (Yet he asked appellant to select four men all of height similar to appellant's.) Vilhauer picked appellant from the lineup.

When Goen did fail to identify appellant, Looney hoped to use her as a defense witness at trial. He talked to her briefly at the lineup, he testified, but not again until the day of the trial. That day, he said, she told him his client was the man she had seen leaving the store "except for his height." He decided she would make an unreliable witness and did not call her.

Looney also never saw or talked to Mrs. Sims. He testified that appellant had not told him she was in the apartment the morning of the robbery, though Looney did know Mrs. Sims lived there.

Looney did not interview Vilhauer or the potential witnesses Shipp and John Williams. He was told by the assistant district attorney that the latter two could not identify the robber. Goen had testified at the hearing that several people were in the washateria at the time of the robbery, including one who claimed to know the robber. Looney had not heard of these potential witnesses.

Looney said that he had talked very briefly to appellant's sister but did not know if it was the same sister appellant had called the morning of the robbery. (Appellant's sister who lived in Wichita Falls appeared at the hearing and testified she had not been contacted by her brother's lawyer. Appellant testified he has five sisters.) He had known the phone bill proving the time of the call existed but had not tried to introduce it because "I didn't feel that was a disputed issue of the trial, the telephone conversation," and the call had not taken place at the exact time of the robbery anyway. Similarly he had known of appellant's bank statement but had not tried to introduce it. He did crossexamine State's witnesses at trial and presented appellant's alibi defense, as well as a witness who testified he had never seen appellant wear his hair as Vilhauer had described the robber's hair.

## II.

The court of appeals' opinion was issued May 9, 1984, without the benefit of the Supreme Court's opinion in *Strickland,* su-

pra, delivered May 14, 1984. We now consider whether the standards of ineffective assistance enunciated in *Strickland* would change the result in the instant case.

*Strickland* began as a Florida State court prosecution for capital murder. The defendant was arrested after a ten day crime spree which included three murders. After he confessed to one of the murders an attorney was appointed to represent him. Against the advice of his counsel the defendant then confessed to the other two murders. Again ignoring his counsel's advice, the defendant elected that punishment be assessed by the trial court alone rather than with the advisory jury allowed under Florida law.

In preparing for the sentencing hearing, counsel spoke only to his client and once on the telephone to the defendant's wife and mother. He did not otherwise seek out character witnesses, although some were available. Counsel also did not have his client examined by a psychiatrist. Only defendant testified for the defense. He testified that he had been very frustrated and angry at the time of the crimes over his failure to provide for his family, but he nonetheless accepted responsibility for his crimes.

The trial court found several aggravating factors to the crimes. The murders had been particularly brutal, each involving repeated stabbings. The mitigating factors, the court further found, were negligible. The trial court sentenced the defendant to death on all three murder charges.

The Supreme Court granted certiorari in *Strickland* because that Court had never before fully considered a case involving allegations of "actual ineffectiveness" of counsel, as opposed to denial of effective representation caused by State action. See, e.g., *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed.2d 158 (1932). The Court used the occasion offered by *Strickland* to set out the claims a convicted defendant must prove in order to have his conviction overturned due to ineffective as-

sistance of his counsel. The Supreme Court offered no mechanistic formula:

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

104 S.Ct. at 2064. Under *Strickland* there are two tests a defendant who seeks relief must meet: "First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* Elaborating on the second showing the defendant must make, the Court said:

"The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Id.* at 2068.

### III.

A defendant in a criminal case is entitled to reasonably effective assistance of counsel. *Ex parte Duffy,* 607 S.W.2d 507 (Tex. Cr.App.1980). This standard has been adopted not only in Texas but by all the federal courts of appeals and the Supreme Court. *Strickland,* 104 S.Ct. at 2064. Stated more fully, the standard is "counsel reasonably likely to render and rendering reasonably effective assistance." *MacKenna v. Ellis,* 280 F.2d 592 (CA5 1961); *Caraway v. State,* 417 S.W.2d 159 (Tex.Cr.App. 1967).

■ In Texas, whether this standard has been met is to be judged by "the totality of the representation," rather than by isolated acts or omissions of trial counsel. *Ex parte Raborn,* 658 S.W.2d 602, 605 (Tex. Cr.App.1983). The test is to be applied as of the time of trial, not through hindsight. *Hawkins v. State,* 660 S.W.2d 65, 75 (Tex. Cr.App.1983).

■ Among counsel's duties is that of making an independent investigation of the facts of his client's case. *Ex parte Ewing,* 570 S.W.2d 941, 947 (Tex.Cr.App.1978).

"It is fundamental that an attorney must have a firm command of the facts of the case as well as the law before he can render reasonably effective assistance of counsel. [citations omitted] A natural consequence of this notion is that counsel also has a responsibility to seek out and interview potential witnesses and failure to do so is to be ineffective, if not incompetent, where the result is that any viable defense available to the accused is not advanced."

*Ex parte Lilly,* 656 S.W.2d 490 (Tex.Cr. App.1983).

As in the instant case, the attorney's duty to investigate was at issue in *Strickland.* The Court held such a duty exists, but its scope may fluctuate under varying circumstances:

"...strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

### IV.

Appellant's trial counsel presented the defenses of alibi and misidentification, which are two sides of the same coin. See *Chambers v. State,* 601 S.W.2d 360, 362 (Tex.Cr.App.1980). For the jury to believe appellant was in his apartment at the time of the robbery, they had to believe the complainant had been mistaken in identify-

ing appellant as the robber. The defenses relied on each other for support. Yet besides appellant, defense counsel put on only one witness in support of the alibi defense, and no eyewitnesses to contradict the complainant's identification. Counsel's failure to call such witnesses would be "irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony." *King v. State*, 649 S.W.2d 42 (Tex.Cr.App.1983). In this case appellant did make such a showing, at the motion for new trial hearing.

Testimony at the hearing revealed there was far more substance to appellant's alibi defense than was presented to the jury. Mrs. Sims testified that she had seen appellant in the apartment at the time of the robbery, and that she would have testified to that effect at trial. Appellant's sister corroborated his story of the phone call between them near the time of the robbery. A telephone company employee was called to show that a record of that call existed. None of these witnesses was called at trial in support of the main defensive theory of alibi.

■ Appellant's trial counsel testified he was unaware that Mrs. Sims had been in the apartment at the time. He did testify, however, that he knew she lived there. Given this knowledge, his failure to independently investigate whether she was there at the crucial time is hard to excuse. Amy Flynn, Looney's associate, testified that she did know Mrs. Sims could support the alibi defense. Though Looney had not "assigned" Flynn to handle this case, he obviously relied on her for preliminary interviews. It was his duty at least to learn what she had been told.

"It is fundamental that an attorney must acquaint himself not only with the law but also the facts of a case before he can render reasonably effective assistance of counsel... [T]hat burden may not be sloughed off to an investigator... It is counsel's responsibility."

*Flores v. State*, 576 S.W.2d 632 (Tex.Cr. App.1979). Similarly the duty to investigate the facts may not be sloughed off to an associate. If counsel does so he must be held constructively aware of the information his associate learns.

■ We cannot find these omissions in counsel's investigation of his client's alibi defense were the result of reasonable professional judgments. It was obvious the State planned to use the lack of Mrs. Sims' testimony when the prosecutor asked appellant on crossexamination if she was in the apartment at the time of the robbery and appellant responded that she was. Counsel should also have anticipated the State's pointing out to the jury that appellant's assertion that he was talking to his sister in Wichita Falls near the time of the robbery was uncorroborated by either the sister's testimony or phone company records. That evidence was available to defense counsel. It is reasonable to assume his failure to produce it fed the jury's doubt in appellant's alibi defense.

Nor was the limited investigation of the defendant's misidentification defense justifiable. Appellant's trial counsel was faced with a positive identification by the complainant. Appellant suggested she knew him instead as a frequent customer of the store. In the face of this direct conflict it was incumbent on the defense to cast doubt on the complainant's identification. The best way to do so, beyond crossexamination, would have been to produce witnesses to say that appellant was *not* the man seen leaving the store immediately after the robbery. Faced with this necessity, defense counsel sought out no potential witnesses and did not interview the witnesses whose names he knew. Counsel testified at the motion for new trial hearing that after she failed to pick appellant out of the lineup he planned to call Goen as a witness at trial; yet in spite of that intention he did not interview Goen subsequent to the lineup until the day of trial. If he had done so he could have learned not only what her testimony would be, but also that the washateria she managed was full of other potential witnesses at the time of the robbery.

Counsel knew Sgt. Williams had seen the robber leaving the store but did not interview him. He relied instead on the report given him by the assistant district attorney that Williams could not identify the man he had seen. That reliance was misplaced.

"The State attempted to show counsel discussed the case with the prosecutor, but reliance upon such conversations and discussions for all information is no substitute for an independent investigation of the facts, particularly when there was no effort to examine physical evidence or to talk to the State's witnesses."

*Ex parte Raborn*, 658 S.W.2d 602 (Tex.Cr. App.1983).

Appellant's trial counsel testified at the motion for new trial hearing that he feared Williams would be impeached with the police report if called as a defense witness. Fear of having a witness impeached, however, does not justify not interviewing that witness at all. Williams could have been able to supply other witnesses or details that would have helped corroborate appellant's story. He could have denied telling police he hadn't seen the robber clearly, as Williams in fact did at the motion for new trial hearing. The witness could have explained that though the day of the offense he had told police he didn't know who the robber *was*, he did know appellant was *not* the man he had seen. That the State would try to impeach the witness would have only been part of the "reliable adversarial testing process" *Strickland* calls for. 104 S.Ct. at 2065. By his failure to investigate this or any other witness, counsel insured that no such testing process took place at trial.

Counsel was aware of the need to cast doubt on the complainant's identification of his client. Given that need, and even applying a heavy measure of deference to counsel's judgment, we cannot find that the decision not to seek out and interview any potential eyewitnesses was a reasonable one.

We hold, therefore, that "counsel's representation fell below an objective standard of reasonableness." *Id.* We now consider the second prong of *Strickland's* test, whether appellant's defense was prejudiced by that failure.

## V.

■ Two of the witnesses defense counsel failed to interview before appellant's trial testified at the motion for new trial hearing that appellant was not the man they saw leaving the scene immediately after the robbery. Further, they identified another man, by name, as the robber. Goen stated, referring to a photograph of the other man, "As God is my witness, this is the robber." Granted, if such testimony had been presented at trial the State would have attacked the witnesses' credibility, as it did at the motion hearing. We are concerned here, however, not with counsel's failure to present the testimony of these witnesses, but with his decision not to perform the investigation that would have uncovered the testimony. Counsel made no tactical decision not to present this testimony evidence. He didn't know the evidence existed. It was due to his failure to investigate that the evidence was not placed before the jury.

No physical evidence linked appellant to the robbery. Only being stopped for speeding near the scene of the offense led to his arrest. He was convicted based on the identification testimony of only one witness, the complainant. The evidence the jury did *not* hear due to trial counsel's failure to investigate consisted of the sworn testimony of two witnesses that someone other than appellant was actually the robber, and of a third witness that appellant was somewhere else at the exact time of the robbery. We find this evidence "sufficient to undermine confidence in the outcome" of appellant's trial. *Id.* at 2068.[1]

1. See *Nealy v. Cabana*, 764 F.2d 1173 (CA5 1985), in which the defendant's conviction was reversed because of ineffective assistance. Trial counsel failed to present three potential alibi witnesses of whom the defendant had informed him. The three testified at a later evidentiary hearing and though their testimony was less certain and helpful to the defense than that of

We hold that the performance of appellant's trial counsel did not meet the standard of reasonably effective assistance established by either our own caselaw or the Supreme Court in *Strickland v. Washington.* The decision of the court of appeals is affirmed and the cause remanded to the trial court for a new trial.[2]

ONION, P.J., and TEAGUE, J., concur.

the "missing" witnesses in the instant case, the Fifth Circuit concluded the defendant had been prejudiced by his counsel's failure to find and present the witnesses.

**2.** *Strickland* interprets the Sixth Amendment to the United States Constitution, and therefore establishes the minimum federal constitutional requirement of effective assistance. *United*

*States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 2050 n. 38, 80 L.Ed.2d 657 (1984). Because we find that in this case that minimum federal constitutional standard was not met, we do not need to address the right to counsel provisions of the Texas Constitution, Article I, §§ 10 and 19.