**Roderick Jarmarlo DAVIS**

v.

**The STATE of Texas.**

**No. 2–93–371–CR.**

Court of Appeals of Texas, Fort Worth.

Aug. 2, 1994.

Publication Ordered Sept. 22, 1994.

Rehearing Denied Sept. 6, 1994.

---

Richard Lee Griffin, Griffin & Owen, L.L.P., Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., Betty Marshall and Charles M. Mallin, Asst. Chiefs of the Appellate Section, Anne E. Swenson, Asst. Dist. Atty., Fort Worth, for appellee.

Before FARRIS, LATTIMORE and DAY, JJ.

**516**

## OPINION

LATTIMORE, Justice.

Appellant Roderick Jarmarlo Davis was convicted by a jury of the offense of murder. *See* TEX.PENAL CODE ANN. § 19.02 (Vernon 1989). The jury assessed punishment at twenty-five years in the Institutional Division of the Texas Department of Criminal Justice. On appeal Davis raises three points of error, contending that his trial counsel provided ineffective assistance by: (1) accidentally striking a black member of the jury panel; (2) failing to object to the State's striking of three black members of the jury panel; and (3) failing to request a charge on voluntary manslaughter.

We affirm.

On the evening of July 19, 1991, Mark Swaynie testified that he, his brother Rick, and their brother-in-law Richard Benefield went fishing at Joe Pool Lake and afterward stopped at several bars. On their way home the three stopped at a fast-food restaurant, where there was a confrontation in which Rick Swaynie was hit in the head. Retreating to their car, the three drove to their apartment complex, which was two blocks away. Rick and Mark then set off on foot to find Rick's attacker. Witnesses at the apartment complex next saw appellant Davis, who lived in the same complex, running up the stairs to his apartment, with Rick and Mark in pursuit. Davis stopped at the top of the stairs, and Rick and Mark stopped at the bottom. Mark yelled at Davis from the bottom of the stairs, but then the two brothers turned and began to walk away. At this point, a car pulled up and two of Davis' friends attacked Rick and Mark. Bystanders threatened to call the police, and the two attackers fled. Mark ran some distance away during the course of this fight, while Rick remained in the area of Davis' apartment. Davis then came down the stairs carrying a knife that he had gotten from his apartment. Rick began to run away, but Davis chased him down and stabbed him in the back. Seeing his brother in trouble, Mark began to run back towards the complex, but was run down and stabbed from behind by one of the other attackers. Mark collapsed next to his brother. Two witnesses

saw Davis being led back to his apartment by his mother after the attack. The mother was seen carrying a knife in her hand. Mark recovered from his wounds, but Rick died the next day.

Davis gave a different version of events to the police in a written statement. In that statement he said that he was chased into his apartment by Rick and Mark, where he told his mother that:

[T]wo white dudes were chasing me and trying to jump on me. My momma and I each got a kitchen knife and my dad grabbed a tire iron. We went outside the apartment, which is upstairs. The white dudes were down there talking trash to some more people that were down there. They seen me and my momma coming down and they started coming up the stairs. I was first kicking and then I started swinging the knife at them. I stabbed the one with the gash in his eye [Rick]. I stabbed him somewhere on the left back side below the shoulders. After I stabbed him we started fighting. Thats when the white dude and mexican dude who had given me the ride came up. The mexican boy had a sharp stick, like the can you stick in the ground. We then chased these dudes off and thats when the ladies came up to us. They wanted to fight us. I think they were the wives or girlfriends of these white dudes we were fighting. My momma told me to not fight the ladies and pulled me away. Thats when we went back upstairs and I threw the knife down.

At trial Davis testified to a different version of events: Davis was chased by Rick and ran up the stairs to his apartment. Rick and Mark did not follow Davis up the stairs, but stopped to talk with bystanders. Davis' mother grabbed a knife and ran out to the stairs. Davis ran out of the apartment with two knives and followed his mother. Rick and Mark came up the stairs and Davis' mother swung her knife to hold them back. Davis' friends then arrived in a car, and Rick and Mark went back down the stairs to confront them. Davis followed them down the stairs and stabbed Mark (not Rick) in the back, leaving the knife in the victim. The

mother's version of events was similar to Davis' in-court testimony.

■ Davis' three points of error involve a claim of ineffective assistance of counsel. A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction has two components. First, a defendant must show that counsel's performance was deficient; second, a defendant must show that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). With regard to a defendant's contention that his counsel was not functioning as the "counsel" guaranteed him by the sixth amendment of the United States Constitution, judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. There is a strong presumption that counsel's performance falls within the "wide range of professional assistance," and a defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305, 323 (1986). The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Id.; see also Butler v. State,* 716 S.W.2d 48 (Tex.Crim.App.1986). Concerning the second prong of *Strickland,* this requires a showing that counsel's alleged errors were so serious as to deprive a defendant of a fair trial, a trial whose result is reliable. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. It is not enough for a defendant to show that the errors had some conceivable effect on the outcome of the proceeding, *id.* at 693, 104 S.Ct. at 2067, 80 L.Ed.2d at 697; he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Basically, the question for our review is whether there is a reasonable probability that absent the alleged errors, the factfinder would have had a reasonable doubt respecting guilt. *See id.* at 695, 104 S.Ct. at 2068–69, 80 L.Ed.2d at 698. In making this determination we must consider the totality of the evidence before the jury and the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. *See id.*

■ In his first point of error, Davis argues that his trial counsel provided ineffective assistance by accidently striking a black member of the jury panel. Davis contends that because this is a black-on-white crime, and because the version of events told by white witnesses differed from the version told by black witnesses, that the racial makeup of the jury was critical. It is Davis' theory that a black juror would have believed the black witnesses, including Davis himself, while the white jurors naturally believed the white witnesses. Davis argues:

> The significance of these errors in jury selection lies first of all in the racially different testimony provided by the white and the black witnesses. The jury's job of evaluating the credibility of the witnesses necessarily implicated dispositions to believe or disbelieve, and such dispositions of credulity are rooted in one's life experiences. They cannot be separated from race in a case like this. Whether a juror believes a black who says a crowd was yelling racial slurs or a white woman who says the contrary is the kind of credibility call that must be made by a jury, but which cannot be separated from the juror's racial experiences.

Three other black venirepersons were struck by the State, leaving an all-white jury. Thus, Davis implies, keeping a black juror on the panel would have led at least to a hung jury. Defense counsel admitted at the hearing for new trial that she had no strategic reason for striking the black venireperson except for her mistaken belief about that venireperson's race. She thought the venireperson was white.

■ Davis offers no evidence that the jury did not listen to the evidence, weigh the credibility of the witnesses, apply the law to the facts, and render a just verdict. Davis'

argument is based on pure speculation and is offered without any supporting authority. *See Routledge v. State,* 834 S.W.2d 452, 459 (Tex.App.—Fort Worth 1992, pet. ref'd) (failure to cite authority waives point on review). We refuse to presume that a jury would have reached a different result if one member of that jury were of a different race. Nor will we sanction the implication of Davis' argument—that if trial counsel had struck a white member of the panel on racial grounds as she had intended, that counsel would have been effective. The Fourteenth Amendment's Equal Protection Clause prohibits the use of peremptory strikes to exclude otherwise qualified and unbiased persons from a jury solely because of their race. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Purposeful racial discrimination in the use of even one peremptory strike is a blow to the fundamental legal principles underlying *Batson* and its progeny. Failure to make a racially motivated strike cannot be ineffective assistance. Point of error one is overruled.

■ Davis contends in his second point of error that his trial counsel was ineffective by failing to raise a *Batson* challenge to the State's striking of three black members of the jury panel. Again, Davis does not offer any evidence that there would have been a different result but for trial counsel's failure to raise a timely *Batson* challenge. *See Williams v. State,* 834 S.W.2d 85, 86–87 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd). Without a record of a *Batson* hearing, there is no way to establish the relative merits of trial counsel not making a *Batson* challenge. The burden is on Davis to present a sufficient record of reversible error. *See* Tex. R.App.P. 50(d). Furthermore, trial counsel testified that she considered bringing a *Batson* challenge and discussed this option with Davis. Ultimately, trial counsel made a strategic decision not to make a *Batson* challenge because she believed it would not be successful. Davis has not shown that the failure to raise a *Batson* challenge was not sound strategy in this case. Point of error two is overruled.

■ In his third point of error, Davis contends that his trial counsel provided ineffec-

tive assistance by failing to request a charge for voluntary manslaughter. We disagree. First, trial counsel could have reasonably decided it was sound trial strategy to give the jury only the options of finding Davis guilty of murder or acquitting. *See Garner v. State,* 864 S.W.2d 92, 102 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd). Trial counsel was seeking an acquittal based on self-defense, or that Davis was only guilty of the attempted murder of Mark, an offense for which Davis was not charged. Furthermore, the evidence does not establish that Davis was entitled to a voluntary manslaughter charge. In all versions of the confrontation, Davis was at the top of the stairs when Mark and Rick retreated to engage the other boys. Rather than being relieved and choosing to remain there safely out of the fight, Davis chased after either Rick or Mark, and stabbed one of them in the back. There was no testimony that Davis was, at the moment that he chased down the victim, in a state of fear or sudden passion sufficient to render the mind incapable of cool reflection. Tex.Penal Code Ann. § 19.04 (Vernon 1989). Clearly, by any version of the events, Davis reengaged in a chase or fight that had been broken off by Mark and Rick. Point of error three is overruled.

The judgment of the trial court is affirmed.