WR-82,063-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/12/2015 8:32:34 AM
Accepted 8/12/2015 10:05:23 AM
ABEL ACOSTA
CLERK

Writ No. WR-82,063-01

| | | |
|---|---|---|
| EX PARTE WHISENANT | § | COURT OF CRIMINAL APPEALS |
| | § | RECEIVED |
| | § | COURT OF CRIMINAL APPEALS |
| HOWARD WHISENANT | § | AUSTIN, TEXAS     8/12/2015 |
| | | ABEL ACOSTA, CLERK |

OBJECTIONS TO TRIAL COURT'S
FINDINGS OF FACTS AND CONCLUSIONS OF LAW

COMES NOW, HOWARD WHISENANT, Applicant and requests this Court remand this writ to the Trial Court and would show unto the Court the Following:

A.  Introduction

1.      Applicant was convicted by a jury of Aggravated Assault (Counts 1-4, 7, 14) – sentenced to 20 years on each; Violation of a protective order (count 5) – sentenced on each to 10 years and 10,000.00 fine; Burglary of a habitation (counts 6) and sentenced to 20 years; Retaliation (count 8) – sentenced to 10 years and 10,000.00 fine; Aggravated Sexual Assault (counts 9-10) – sentenced to 70 years and 10,000.00 fine on each; Obstruction (count 12-13) – sentenced to 10 years on each. All counts punishments ran concurrently.

2.      On August 18, 2014, Applicant, by and through his attorney of record, filed Applicant's writ of habeas corpus pursuant to Texas Code of Criminal Procedure Art. 11.07. Applicant was claiming 6 grounds for relief. Grounds One and Two were based upon the use of knowing false or perjured testimony, ground three was due to prosecutorial misconduct, grounds four, five and six were allegations of ineffective assistance of counsel.

3.      This Court remanded this application to Trial court to resolve factual issues and to make findings of facts and conclusions of law. The trial court filed the findings of fact and conclusions of law and they were forwarded to this Court.

4.      From these findings of fact and conclusions of law filed by the trial court, Applicant now files these objections.

B.  Factual Background

Appellant and Tracy Whisenant, the alleged victim, were married on August 14, 1982.  [R.R. vol. 4, p.  140]. They have (5) five children.  [R.R. vol. 5., p. 58].   All five children testified at trial.

The indictment included fourteen counts. Thirteen of the counts revolved around alleged assaults on Tracy Whisenant. One of the counts alleged an assault on Janey Whisenant.  [C.R  pp. 16-19].

Trial  began  on  May  22, 2001. In count 5 of the indictment, Tracy Whisenant stated that the alleged assault took place at the old Burleson High School parking lot on the morning of September 19, 1998. [RR vol. 5, pp. 80- 81]. Tracy Whisenant further stated that no one was around, nobody was in the parking lot, and that she looked before she stopped Furthermore, in 1998, Tracy Whisenant told the Burleson police that the alleged assault took place at the Eckerd's parking lot by an unknown person.  [RR vol. 4, p. 106].

Tracy Whisenant  testified that the  counts,  2 through 5, took place  at their home  on August  31, 2000,  between  9:00 a.m. and 11:00 a.m. [R.R. vol 5, pp. 117-119].   The appellant testified  that  he  was  at  the  residence  for  about  ten minutes around  11:00 a.m. saying he returned  home from work to look for some payroll  records.   [R.R. vol. 10, pp.  135,136]. He also testified that his wife was not there when he arrived that morning. Tracy Whisenant did not report the alleged assault until September 6, 2000, six days later. [R.R. vol. 5, p. 129-134]. Dr. Saty testified that when she examined Tracy on September 6, 2000, she had been very recently assaulted, no earlier than the night before. [R.R. vol. 7, pp. 89,90].

Tracy Whisenant testified that counts 6 through 11 took place at the residence of Al and Blanche Ingram, her parents. [R.R. vol. 5, pp. 140-148]. She also testified that it took place on

January 11, 2001, between 3:00 am. and 4:00 am.. [R.R. vol. 5, pp. 145-148]. Detective Allan Gilreath of the Johnson County Sheriff's department testified that the only evidence taken from the scene was a .38 handgun, owned by Tracy Whisenant, two shells, (both in the gun - one spent and one live round), and one pillow with blood on it. [R.R. vol. 8, p. 144]. There was also a live round found in Tracy's pant's pocket. [R.R. vol. 9, p. 22]. Detective Allan Gilreath also testified that there was no physical evidence to link the appellant to the offense and that his investigation was totally based on Tracy Whisenant's statements.      [R.R. vol. 8, pp 181,182].  There were no defensive wounds on the appellant. [R.R. vol. 8, p. 171].

Count 14 concerned an alleged assault against Janey Whisenant, the appellant's daughter. Kara Whisenant also testified as a witness. There was no physical evidence to support the allegation. Although use of a firearm is alleged, no weapon was ever introduced into evidence, nor was ownership of a gun ever verified. [R.R. vol. 7, p. 142].

Subsequent to trial, Janey Whisenant has filed an affidavit stating she falsely testified to the following facts:

• 	I knew that my Dad had caused my Mom's bruises because I heard "banging" form their bedroom when only they were in there, and the next morning I saw bruises on my mother. In fact, I never heard banging, and my statements that my Dad was beating my Mom was based entirely on what my mother told me.
• 	One time I saw my father walk up to my mother from behind her, grab the back of her head, and shove or push her down while kicking her. In fact, I never saw such an incident.
• 	One time in September of 2000 my Dad came into my room while I was asleep, pulled me out of bed by the back of my hair, asked me where Mom was and when I refused to tell him pulled a gun with a black handle, pointed it at my head and told me I knew he was lying when I said I didn't know where Mom was, and that he was going to find Mom, bring her back to the house, kill us, and then kill Mom and shoot himself. In fact, Dad did not pull me out of bed by my hair and he didn't display a gun. As far as I knew, he didn't have a gun. And he didn't threaten to shoot us and kill Mom and himself.
• 	My Mom had not "put me up" to calling my father's alibi witnesses prior to his trial. In fact, she had manipulated me into speaking with them, to try to see if I could talk them out of testifying in favor of my Dad.

In her affidavit Janey Whisenant clearly explains and gave a credible explanation as to why she gave the false testimony at trial. Janey Whisenant further explains why she did in fact decide to seek out Applicant's Counsel and Counsel's investigator in order to attempt to correct her false testimony.

Subsequent to trial, Brad Ingram (Brad Whisenant at trial) filed an affidavit stating he falsely testified to the following facts at trial:

- One time I woke up while sleeping in my parents ' room and saw my father's hand on my mother's head and heard a bang and saw my mother's head slammed into a wall. In fact, I did not hear or see such an incident.
- One time I was sitting with Heidi on a window-sill in our house, I saw my parents' pull into the drive-way, and saw my father pull my mother out of the car by grabbing and pulling her by her hair and "yanking" her out of the car. In fact, I saw no such incident.

As with Janey, within the affidavit was a very reasoned and logical explanation as to why Mr. Ingram testified falsely and decided to come forward to correct his false testimony.

In addition to Brad Ingram and Janey Whisenant, Kara Ingram (Kara Whisenant at trial) provided an affidavit that she had testified to the following facts that were in fact false:

- One time I saw my parents in their bedroom, that my father "had a hold" of my Mom with one hand on her neck, and that when he saw me he "relapsed her by shoving her to the ground." In fact, I saw no such incident.
- One time I heard "loud banging noises" coming from my parents' bedroom and that I heard my Dad say to my mom "Shut up." In fact, I did not hear or see such an incident
- One time I saw my father with his hands around my mother's neck "in a position that did not look very comfortable at all." In fact, I had never seen such an incident.
- I saw one time in 2000 an incident in which my father held a gun to the head of my sister Janey. In fact, I had never seen my father with a gun, much less a gun pointed to my sister's head.
- One time I saw my father assault my mother. In fact, I had never seen my father assault my mother.
- One time I saw my father slam my mother's head into the pole of a fence around the swimming pool in the back yard of our house. In fact, I had never seen such an incident.
- I had first seen bruises on my mother in 1995 or 1996. In fact, I never saw bruises on my mother until the incident at Eckerd's in 1998.

Consistent with Kara's brothers and sisters, Kara explained why she felt compelled to give the

false testimony that she gave at trial. She also in detail explained why she felt compelled to try to correct her false testimony and thus gave her affidavit.

Heidi Ingram (Heidi Whisenant at trial) also testified falsely at trial. Heidi gave an affidavit stating she testified falsely to the following facts:

- I did "good" during my eight grade. That was one of my worst years in school. I testified that I did "good" in school that year because I thought it would made my mother look good.
- One time I woke up because I heard a "bang," and I walked down to my parents' room and saw my father hitting my Mom. In fact, I did not hear or see such an incident.
- One time I was sitting with my brother on a window-sill in our house, I saw my parents' pull into the drive-way, and saw my father pull me mother out of the car by grabbing and pulling her by her hair and "yanking" her out of the car. In fact, I saw no such incident.
- One time while sleeping with on the floor in my parent's bedroom I woke up and saw my father make a fist and hit something or someone under the covers. In fact, I didn't see any such incident.

Within the affidavit was also a reasoned logical and credible explanation as to why Heidi gave the false testimony at trial and why she decided to come forward and recant that false testimony.

In addition, the Whisenant's final child, Keli Ann Whisenant also gave an affidavit that she had testified falsely to the following facts:

- My mother told me I could talk with my father after he was arrested. In fact, she told me that if I spoke with him and he learned as a result where we were, he would come and kill us.
- "A bout every other night" I heard yelling and screaming come from my parents' bedroom while my parents were in there, and I heard my Mom saying "stop it." In fact, I never heard anything like that.
- I saw my Dad push my Mom into the fence surrounding the swimming pool at our house, and she fell to the ground. In fact, I didn't see any such incident.

Just like all the other children, the affidavit contained a detailed, logical credible reason Keli Ann gave the false testimony. Keli Ann also gave a very good explanation as to why she came forward to give the affidavit explaining her false testimony.

C. Objections to Factual Findings

**1. Determining that the Children's affidavits that their testimony at trial was
False and was not credible and that the false testimony was not material**

Applicant first objects to the findings the trial court made that the five children's testimony at trial was true and the affidavits were in fact false or not credible. Applicant would assert that a factfinder cannot make a determination on credibility solely from an affidavit without having a live hearing to witness the demeanor of the witnesses as they testify. Because the [factfinder] is 'Johnny-on-the-spot,' personally able to see and hear the witnesses testify. [The factfinder] makes credibility determinations, based upon demeanor, tone of voice, hesitancy of speech, perhaps the almost imperceptible shrug of shoulders, tightening of the jaw, or clench of fists." Manzi v. State, 88 S.W.3d 240, 254 (Tex. Crim. App. 2002) (citing Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985). This cannot be done solely from a piece of paper.

Counsel has been accused of trying to game the system in this case because Counsel took strategic steps to attempt to try to force the trial court into having a live evidentiary hearing so the trial court could witness the demeanor of the five children in determining the credibility of their affidavits. Applicant felt anyone that heard the children testify about their false testimony and why they testified falsely, there would have been little doubt in the children's veracity. Counsel was trying to avoid the exact situation that occurred in this case, deciding the veracity of brave young adults trying to remedy the effects of their false testimony at trial.

Even looking at the affidavits, there is clear indicia of reliability and credibility within the affidavits. It is consistent in each and every affidavit that the children did not discuss their affidavits and drafting of the affidavits with anyone each other. Yet each was clear and constituent in explaining why they felt compelled to give the false testimony that they gave at trial. They were all also constituent in showing how their mother had manipulated and coached these children (none older than 17 years of age at the time of the trial). In addition, each affidavit shows that the children

were seeking out Applicant's counsel and counsel's investigator in order to set the record straight as to each of their false testimony. Finally, each affidavit clearly established that none of the children were offered or gave anything in exchange for their affidavit.

Attached as Exhibit A is the affidavit of Ryan Ross[1] an investigator from Denver, Colorado. Mr. Ross details the steps he took to ensure that each child's affidavit was their own independent recollection of events. In addition, it shows the steps Mr. Ross took to make sure the affidavit testimony of each child was not cross contaminated by the testimony of the other children. Furthermore, Mr. Ross, who is the only person who has talked to the children in person, details why he found that the five children incredibly credible in recanting their false testimony.

In addition, the false testimony of the children was clearly material. The false testimony clearly did harm Applicant, thus Applicant is entitled to relief.

The Supreme Court of the United States recognized that a conviction obtained through the use of false testimony reaches constitutional proportions. Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); Napue v. Illinois, 360 U.S. 264, 79 S. Ct., 1173, 3 L. Ed. 2d 1217 (1959). 'A new trial is required if 'the false testimony . . . in any reasonable likelihood could . . . have affected the judgment of the jury . . . .' Napue, supra, at 271, 3 L Ed 2d at 1222; Giglio v. United States, 405 U.S. at 154.

The Texas Court of Criminal Appeals has followed the United States Supreme Court by stating:

> Under Giglio v. United States, supra, a new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury. 92 S. Ct. at 766. It is clear that appellant could not have been convicted without [witness'] testimony. Under these circumstances we cannot conclude that the judgment of the jury could not have been reasonably affected by this testimony, and thus the conviction must be reversed.

---

[1] Ryan Ross' affidavit is being mailed to the Johnson county district clerk the same day this response is being filed.

Granger v. State, 683 S.W.2d 387, 391(Tex Crim App. 1984).

This case primarily turned on the testimony and ultimately the credibility of Tracey Whisenant. Tracey Whisenant knew and understood if she could manipulate and properly coach her children to testify falsely, then that would bolster Tracey's own credibility and help ensure Applicant was convicted. The children testifying falsely to witnessing assaults or having assaults committed against the children, Tracey Whisenant understood, would help ensure Applicants conviction.

While it is true that only one child, Janey Whisenant, testified to have an assault committed against them, all the children's false testimony had such an emotional impact on the jury, it all but assured Applicant's conviction and incredibly high sentence. The impact of hearing a young teenager falsely testify as to how her father put a gun to her head and threatened her all but sealed Applicant's fate. That coupled with all the other children testifying falsely to witnessing assaults alleged committed by Applicant against their mother caused the false convictions and unusually high sentences for someone with no prior criminal history.

### 2. Finding that it was not ineffective assistance of counsel to interview or call Alibi witness

The trial court in their findings found that affidavit of Mohammad Ibrahimi was credible but not material. This affidavit clearly established an alibi for Applicant on August 31, 2000, for Applicant.

There is a two-pronged test to ineffective assistance of counsel claims. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). First, Applicant must show that his counsel's performance was deficient; second, appellant must show the deficient performance prejudiced the

defense. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.

Counsel has the duty to make an independent investigation of the facts and circumstances of the case by seeking out and interviewing potential witnesses. Ex parte Welborn, 785 S.W.2d 391, 395-96 (Tex. Crim. App. 1990); Ex parte Ybarra, 629 S.W.2d 943, 946 (Tex. Crim. App. 1982); Ex Parte Duffy, 607 S.W.2d 507, 517 (Tex. Crim. App. 1980), overruled on other grounds by Hernandez v. State, 988 S.W.2d 770 (Tex. Crim. App. 1999); Butler v. State, 716 S.W.2d 48, 54 (Tex. Crim. App. 1986). Once counsel has investigated the facts and developed a defensive theory, counsel is obligated to present sufficient available evidence in support of that defensive theory. See Duffy, 607 S.W.2d at 518; Butler, 716 S.W.2d at 54-55; Shelton v. State, 841 S.W.2d 526, 527 (Tex. App.--Fort Worth 1992, no pet.).

The failure to adequately investigate or to present an alibi defense has been held to constitute ineffective assistance of counsel on many occasions. See Butler, 716 S.W.2d at 55-56 (counsel failed to interview or call known fact and alibi witnesses or investigate other exculpatory evidence); Shelton, 841 S.W.2d at 527 (counsel failed to call alibi witness); Doherty v. State, 781 S.W.2d 439, 442 (Tex. App.--Houston [1st Dist.] 1989, no pet.) (counsel failed to subpoena any witnesses, failed to investigate a different possible suspect, an alibi witness, and fact witnesses); see also Ex parte Lilly, 656 S.W.2d 490, 493 (Tex. Crim. App.1983) (counsel spent only minutes preparing for trial, did not conduct any investigation or call any witnesses); Haynes v. State, 790 S.W.2d 824, 827 (Tex. App.--Austin 1990, no pet.) (counsel did not interview available, beneficial defense witnesses and did not visit scene of offense). The burden is on the defendant to show that the purported alibi witnesses were available and that their testimony would have been helpful to him. King v. State, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983) (holding that failure to call a witness may support ineffective assistance of counsel claim only if it is shown witness was available and

defendant would have benefitted from testimony); see also Butler, 716 S.W.2d at 55 (same).

Mr. Ibrahimi, it is shown by his affidavit, was available and willing to testify. There was no indication that trial counsel even interviewed Mr. Ibrahimi before trial. Only after the fact, does trial counsel in their affidavits claim Mr. Ibrahimi's testimony would have not been material. Trial counsel felt that this testimony would not create an alibi for all the alleged assaults.

The truth is this witness could have created an alibi for Counts 2, 3,4 and 5 (these al allegedly occurred between 10:00 a.m. and 12:00 p.m. on August 31, 2000 – the time covered by the alibi supplied by Mw. Ibrahimi). Given that every other count in the indictment, save count 14, all dealt with Tracey Whisenant and her credibility, being able to disprove that several of the assaults could not have occurred because Applicant could not have committed the assaults would have had the effect of discrediting Tracey Whisenant and disproving the other alleged assaults. If one can conclusively prove Tracey Whisenant lied about four of the alleged offenses, then it throws into doubt every other alleged offense she testified Applicant committed.

Clearly not being able to discredit his chief accuser did prejudice Applicant. Not having an alibi to help show Tracey Whisenant fabricated all the alleged assaults against Applicant caused Applicant's convictions. Applicant should be entitled to relief on his ineffective assistance of counsel gound.

### 3. Finding that it was not ineffective assistance of counsel to Not investigate the relationship between Tracey Whisenant and Mike Gamble

While the trial court stated in their findings of fact that trial counsel's performance was not deficient, the trial court did not specifically state the basis that they decided trial counsels performance was not deficient in regards to not investigating Mike Gamble.

A clear issue at trial for the jury to resolve was Tracey Whisenant's credibility. For Applicant's defense to have been successful, Applicant needed to provide a motivation and a

reason for Tracey Whisenant to fabricate her stories and lie about the criminal episodes. The fact Tracey Whisenant was living a secret life of working in strip clubs and having an extra marital affair would have provided a powerful motivation for Tracey to fabricate the stories of abuse because the secret life Tracey was leading would have hurt her custody case and property settlement case in her divorce of Applicant. In addition, with reports within police reports that were not followed up upon referring to a boyfriend of Tracy Whisenant, outside her marriage, and that the boyfriend beat her up. [RR. vol. 4, p. 110], investigating and determining Mike Gamble was this boyfriend could have given an alternate explanation for some of the injuries Tracey Whisenant sustained..

Trial counsel claimed in his affidavit he had investigated the strip clubs and possible connections to Tracey Whisenant and Mike Gamble. Trial counsel felt he determined there was no connection. However, Mr. Kleinschmidt does not provide any interview notes of who he talked to and when to establish there was no connection of Tracey Whisenant and Mike Gamble to a secret life. This is another example if there was a live hearing, Mr. Kleinschidt could have been cross examined about who he did and did not interview regarding this case.

Trial counsel claimed they could not find any evidence of Tracey Whisenant working in a strip club or having a relationship with Mike Gamble. Yet, a third year law student in several weeks was able to establish the connection. This connection could have gone further to discredit Tracey Whisenant's credibility and help show Applicant did not commit the offenses he was accused of committing..

Clearly no investigating and presenting evidence of Tracey Whisenant's secret life was deficient performance. Applicant was prejudiced, because this deprived Applicant of key evidence that would have extremely discredited Tracey Whisenant's creditability.

Given the preceding, Applicant prays that court grant him relief in his habeas petition before this court.

Respectfully Submitted,


__/s/ Scott Pawgan_____
Scott Pawgan
State Bar No. 24002739
122 W. Davis, Ste 106
Conroe, Texas 77301
936-242-6975 Phone
936-788-6199 Fax

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was on the August 12, 2015 was filed with the Clerk of the Court using the Texas efile system which automatically notifies all necessary parties.


__/s/ Scott Pawgan_____
Scott Pawgan