# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

===============
## NO. 03-00-00351-CR
===============

**Rochelle Reed, Appellant**

**v.**

**The State of Texas, Appellee**

========================================================================
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
### NO. 0995185, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING
========================================================================

Appellant Rochelle Reed waived a jury trial and entered a not guilty plea; the trial court found her guilty of the offense of retaliation. Tex. Penal Code Ann. § 36.06 (West Supp. 2001). Appellant's punishment, enhanced to a second-degree felony by prior felony convictions, was assessed at imprisonment for three years.

Appellant complains that the evidence is insufficient to sustain her conviction, the trial court erred in admitting hearsay evidence, and that she was denied the effective assistance of trial counsel. We affirm the judgment.

A person commits a third-degree felony if she intentionally or knowingly threatens to harm another by an unlawful act on account of the other's service as a prospective witness. *Id.* § 36./06(a)(1)(A). As amended, the indictment alleged that appellant on or about the seventeenth day of August 1999 did then and there "intentionally and knowingly threaten to harm,

over the phone, another, to-wit: Eric Jeffries and Eric Jeffries' children, by an unlawful act, to wit: by shooting Eric Jeffries' children and threatening to blow their heads off in retaliation for and on account of the service of the said Eric Jeffries as a prospective witness."[1]

In her sixteenth point of error, appellant insists that: "The judgment should be reversed because the evidence was insufficient to prove beyond a reasonable doubt that appellant threatened Eric Jeffries in retaliation for or on account of the service of Eric Jeffries as a [prospective] witness against her."[2]

In reviewing the legal sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *accord Patrick v. State*, 906 S.W.2d 481, 486 (Tex. Crim. App. 1995); *Geesa v. State*, 820 S.W.2d 154, 167 (Tex. Crim. App. 1991);

---

[1] In another paragraph, it was alleged that appellant had previously been convicted of three felony offenses. Appellant pled "true" to these alleged prior convictions. Proof of any one of these prior convictions raised the punishment for the charged offense from a third degree felony to a second degree felony.

[2] A "global" point of error, such as this, complaining of the insufficiency of the evidence does not properly raise factual sufficiency for appellate review. *Martinets v. State*, 884 S.W.2d 185, 189 (Tex. App.—Austin 1994, no pet.). "After a court of appeals has determined that the evidence is legally sufficient under *Jackson [v. Virginia* , 443 U.S. 307 (1979)] to support the verdict, it may proceed further to review factual sufficiency *if it is properly raised*." *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996) (emphasis added); *accord Davila v. State*, 930 S.W.2d 641, 648 (Tex. App.—El Paso 1996, pet. ref'd). Although factual sufficiency has not been properly raised by a separate point of error, we will, in the interest of justice, review the factual sufficiency of the evidence.

*Roberson v. State*, 16 S.W.3d 156, 164 (Tex. App.–Austin 2000, pet. ref'd); *King v. State*, 17 S.W.3d 7, 13 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd).

In reviewing factual sufficiency of the evidence, we view "all the evidence without the prism of 'in the light most favorable to the prosecution.'" *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Stone v. State*, 823 S.W.2d 375, 381 (Tex. App.–Austin 1992, pet. ref'd). In performing a factual sufficiency review, the courts of appeals are required to give deference to the jury verdict and examine all of the evidence impartially, setting aside the jury verdict "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. State*, 958 S.W.2d 404, 410 (Tex. Crim. App. 1997) (quoting *Clewis*, 922 S.W.2d at 129). Recently, the *Clewis* standard has been reprised, "[T]he complete and correct standard a reviewing court must follow to conduct a *Clewis* factual sufficiency review of the elements of a criminal offense asks whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

We first summarize the evidence to determine its legal sufficiency of the evidence. In 1994, Eric Jeffries, an Allstate Insurance Company agent, met appellant when she was referred to him by an automobile dealer. Later, Jeffries introduced appellant to his friend and customer, Fabian Jones. Jones and appellant formed a romantic relationship that lasted "approximately a year, two years." Appellant became pregnant, and to determine whether Jones fathered her

3

unborn child, they consulted a physician to obtain DNA tests. Appellant thought Jones had in his apartment a file containing information about the DNA tests. In a telephone conversation, appellant told Jeffries that she was going to get a locksmith to help her gain entrance to Jones's apartment so that she could get possession of that file. Unbeknown to appellant, Jeffries taped this conversation and alerted Jones. Jones remained in his apartment and surprised appellant and the locksmith when they entered his apartment. Jones filed charges against appellant for burglary. Jeffries and Jones gave statements to the investigating officer and furnished him the taped conversation between appellant and Jeffries.

When appellant was tried for that burglary, Jeffries was called as a witness. Jeffries was present in court but did not testify because appellant entered a guilty plea; appellant was sentenced to serve a three-year prison term. Soon after being released from prison, appellant called Jeffries at his place of business. Jeffries testified relative to the telephone call that: "She [appellant] said, 'This is Rochelle. You thought I forgot about you, but I hadn't and I'm going to get you. I'm going to set you up like you set me up,' and she told me that she was not going to go after my business this time; she was going to go after me personally and my family. . . . She said she was going to blow my . . . kids' heads off. She felt like I set her up and was responsible for her going to jail."

When viewed in the light most favorable to the prosecution, this evidence was sufficient for the trial court, as the trier of fact, to find the essential elements of the crime charged beyond a reasonable doubt. The evidence is legally sufficient to support the judgment.

4

We review the remaining evidence to determine whether the evidence is factually sufficient. The evidence that Jeffries was a prospective witness in appellant's trial for burglary of Jones's apartment is not disputed. However, appellant vehemently denies threatening Jeffries by telling him she would blow his children's heads off. The State's case was dependent upon Jeffries's credibility and appellant's defense was dependent upon her credibility.

Apparently to resolve the credibility issue, evidence was offered, by both the defense and the prosecution, that included the relationship that existed between appellant and Jeffries for six or seven years. Appellant and Jeffries's versions of the relationship were quite different. Jeffries adamantly maintained that he never had a sexual relationship with appellant. He testified that they had a business relationship in which she referred clients to him and he had assisted her in locating a house. Jeffries testified that soon after they met, appellant told him that Dee Brown, a Boston Celtic basketball player, wanted to marry her and wanted to buy her a house in Austin. Jeffries said appellant paid him $500 or more a week for several weeks while he assisted her in finding a suitable house. After looking at many houses, they found one that appellant liked which was priced in excess of $600,000. Jeffries then obtained the help of a realtor to assist in the negotiations for the house. When Brown was contacted concerning the house, Brown's lawyer responded that Brown was married and did not know appellant. Jeffries claimed this episode damaged his reputation with the realtor.

The thirty-one-year-old appellant testified that she had three children and had lived in Austin all of her life. She admitted that she had been convicted previously of "a few

5

misdemeanor theft by check" cases and of five felonies—"Theft by check, aggravated theft, burglary of a habitation, food stamp fraud, securing execution by deception."

Appellant testified she met Jeffries in October 1994 when she bought insurance for a new car. Speaking of Jeffries, a former professional football player, she testified: "We had a sexual relationship, but we never went out because he was married." This relationship began, "at a Super Bowl party with present and past NFL football players. This was January 30, 1995 when we first had sexual intercourse." According to appellant, her romantic relationship with Jeffries continued until "about 1997." Jeffries would come to the duplex where appellant lived "on Aberdeen off of Rundberg." However, Jeffries "didn't like the idea of the maintenance man would come into my duplex and, you know, one day I came home, I had a washer and dryer and $100 on the bar. He didn't like that, so he put me in a duplex in Anderson Mill at Hunter's Chase." Jeffries was the property manager of the duplex to which he moved appellant. Jeffries helped appellant register her three children in the elementary school across the street from the new duplex. Appellant did not pay any rent for her new duplex. Sometimes Jeffries would make appellant's car payments. Jeffries would come to the duplex to fix the plumbing. "[W]e would have sex. It started in the garage, over the whole house. . . . He put me up right around the block from his house."

Appellant testified that Jeffries's testimony that they went around town looking at expensive houses was total fiction. However, appellant recalled one occasion when she accompanied Jeffries to visit one of Jeffries' friends at the friend's place of work. Jeffries and

6

the friend had played football together and the friend had later played for the Philadelphia Eagles. Near the friend's place of work, they stopped and looked at a house "that was just extravagant."

Appellant testified that she went to Jamaica with Jeffries and a group of people including Jeffries's wife. After the check appellant had written to pay for her trip "bounced," Jeffries paid for appellant's trip. While they were in Jamaica, "as soon as his wife passed out from drinking, he would come get me from my room or come to my room."

Appellant's recollection of meeting Fabian Jones was different from that of Jeffries's account. She testified:

A. Me and Eric Jeffries, we just came from lunch. And Fabian came to pay his car insurance before he went to work. And I noticed he was looking at me and I was looking at him. So I got his telephone number off his application, and so I called him at home, you know. And when I called him, I didn't say who -- I said I was Rochelle Reed with MCI. That's how I started the conversation. And then I was just like, "Look. I'm the girl in the white Mustang convertible that you seen at Allstate today." And that's how we met.

Q. Did -- were you still in a romantic relationship with Mr. Jeffries at the time?

A. Yes.

Q. Did Mr. Jeffries become aware of your then starting to see Mr. Jones?

A. Yes. He had Mr. Jones' address and he would come leave notes on my car when he knew I was over there or he would call me on my cell phone while I was upstairs in the apartment.

Q. Was he happy about your seeing Mr. Jones?

A. No.

Q. Now, during the course of all this interrelated situation, did you make complaints with Allstate about Mr. Jeffries?

7

A.  Yes.

Q.  And did that have something to do with an insurance policy for your daughter?

A.  Yes.

Q.  And what was the situation with your daughter and your need for insurance?

A.  . . . I wanted to get life insurance through Allstate for her.

   . . . And Mr. Jeffries told me she got approved and everything. And I was paying money for this policy that never existed, and when I asked him for a copy of it, he would always say that he'll bring it over to the house. And finally in '97 I just called the Allstate business office and asked them did my daughter have a policy and could I have a copy of it. And they told me that my daughter was denied.

Q.  So that's what you made a complaint to some of the Allstate people about?

A.  Yes.

Q.  And you have also made a complaint to one of the officers that testified here the other day?

A.  Yes. I never met him physically. I guess that was him that I talked to over the phone. I never met him physically.

Q.  I believe Officer Toney or Tones, whatever?

A.  Yes.

Q.  Now, can you remember approximately what date, month and year was this incident where you went into Mr. Jones' apartment?

A.  I could say it was February of '98.

Q.  That's --

A.  I could say it's around February '98.

Q. Okay. And ultimately there was a warrant issued and you were arrested for that case, correct?

A. Yes, sir.

Q. All right. And you ultimately pled --

A. Guilty.

Q. -- guilty to that case and the other cases. And that was --

A. Aggravated theft.

Q. No, no. That was when?

A. That I pled guilty? July 7, 1998.

Q. Okay. And you then went to TDC or state jail?

A. I went to TDC September 4, 1998.

Q. All right. Then did you spend your whole time in the TDC unit?

A. Yes, I did. And not the whole time. I was bench warranted back June 26th, 1999 to testify against Cleve Moten.

* * * * *

Q. Yes. They were looking to see if you were aware of any illegal activities on his part, right?

A. Yes.

Q. Now, you then got out of TDC in August, correct?

A. August 10 on a Tuesday.

Appellant testified that she served nine months in prison and found it very unpleasant; she resolved to "do everything right." She went to the Department of Public Safety

9

to renew her driver's license. She found that there was another Rochelle Reed, and that there was an unserved felony warrant for the arrest of the other Rochelle Reed. This prompted appellant to talk to a DPS officer who explained how she could get a new driver's license number. To drive her car, appellant knew she would have to obtain liability insurance.

Appellant called A-1 Insurance Agency and was told to call back later. She testified:

Q. And did you make the call again?

A. Yes.

Q. And what occurred on this call?

A. I told him that I called earlier. I gave him my name. I started to give him the model and make of the vehicle. And then he said, "Ms. Reed." And when he said "Ms. Reed," my heart dropped.

Q. And why was that?

A. Because Eric Jeffries is the only one -- male that ever called me Ms. Reed.

Q. So you identified yourself by name?

A. I told him my name.

Q. And then you stated your car, and then he interrupts with that.

A. Yes, he told me he was there by his self.

Q. Okay. So did you -- did he say who he was or did you realize?

A. I realized who he was.

Q. And were you surprised to hear his voice?

10

A. Yes. I been to that office before, but he told me he was selling Primeco telephones.

Q. And you weren't aware that he was selling insurance with A-1?

A. No, I thought his insurance days were over with.

Q. So then what happened and what kind of conversation took place?

A. It wasn't much of a conversation. He told me he was there by his self and come over for the chair. And I hung up the telephone. That was it.

Q. And what did you interpret that to mean?

A. The chair? Sex. We called it with our pet names. We called it the chair.

Q. And when had been the last time you had had any communication directly with him?

A. Before I went to TDC during the conversation with the burglary of a habitation.

Q. And you recognize Sergeant Canales was the one that investigated that?

A. Yes, he was the detective that was on the case.

Q. And back at that point in that burglary investigation, did you acknowledge, to the sergeant at least finally at some point, that you had been involved with both of these individuals?

A. Yes. I told him, but he told me he already knew that.

Q. And who had he talked to prior to you?

A. Eric Jeffries and Fabian Jones.

Q. And so he seemed to acknowledge that he knew you had been romantically involved with both of those people?

A. Yes, yes.

11

Q. Now, Rochelle, when you made this call -- let me rephrase that. At any time did you make a call to Eric Jeffries in August of 1999 threatening him in any manner?

A. No, sir.

Q. Is Eric Jeffries aware of your problems, criminal problems from the past?

A. Yes.

Q. So he would be aware that you have convictions from the past; is that right?

A. Yes.

Q. Would he be aware that maybe some people might doubt your word because of that?

A. Oh, yes. He knows that. He got upset with Skip Roberts because they believed me and he brought that up to my attention. He couldn't believe that they took a statement from a convicted felon.

Q. What reasons do you believe that Eric Jeffries would have to hold a grudge or be mad at you?

A. I can answer the question? Because I turned Eric in for the money at Allstate. He was not only using me, he was trying to blame his secretary for stealing money. He had just gotten in a real financial bind.

Q. And was he mad that you ultimately finally ended the sexual relationship you had with him?

A. Yes, I couldn't take it no more.

Q. And do you know whether or not he ever revealed any of this to his wife?

A. I don't think -- if he's denying it to you all, I know he denied it to his wife.

As appellant was about to finish her testimony, she was asked:

12

Q. Now, Rochelle, obviously you know that there's -- from your past history, at least in the last 10 years or so, there are many reasons why this judge might have doubts to believe your word; is that right?

A. Right.

Q. And is there any reason in particular that you think, why should she believe your word in this case?

* * * * *

A. In the past when I have done bad things and made up things and got a plot and I contacted Eric Jeffries, I got taped. And I wouldn't have called Eric again and threaten his kids, knowing he could possibly tape me again. And when he asked me to come by the office, I knew that that was not the place to go because when I went to TDC, I knew when I got out I had to make a change and going back to old habits was going to land me right back in TDC. And I did not want to go over to Eric Jeffries' office when he asked me to come over there. I know I committed crimes. I pled guilty to all of those. I did my time, and when I got out of TDC, I never wanted to go back to jail, ever.

Michael Canales a detective with the Austin Police Department investigated the "unique" burglary of Fabian Jones's apartment. Canales interviewed and obtained statements from Jones, Jeffries, and appellant. Canales had the taped conversation between appellant and Jeffries in which appellant told Jeffries of her plan to enter Jones's apartment to obtain DNA reports. After appellant made her first sworn statement denying that she entered Jones's apartment, Canales testified he played a portion of the tape for appellant. Appellant became nervous and said she would change her earlier statement and tell the truth. In her second statement, appellant stated that she entered Jones's apartment because she had been raped.[3] Later

---

[3] Appellant later confessed that her second statement that she had been raped was untrue. She was trying to make Jones feel sorry for her.

13

appellant called Canales and told him Jeffries had threatened her. In his interview with Canales, Jeffries told Canales that he was concerned that appellant would retaliate against him. Canales affirmed that it was clear that the burglary "was based on these DNA records." The DNA records that Canales saw "appeared to be DNA records between Ms. Reed and Mr. Jones." Canales testified that he was familiar with appellant's reputation for telling the truth and that he "wouldn't put much credibility on it."

Troy Gay, an Austin Police Department employee, testified that on August 19, 1999, he had a conversation with appellant. Appellant wanted to renew her complaint of aggravated assault against Fabian Jones. After making her original complaint about this alleged offense, appellant asked that the case be closed because she was "pregnant" and because there were "some complications." Because it was still within the statute of limitations, Gay reopened the case and assigned it to another detective.

Daniel Toney, a detective with the Austin Police Department, testified that on March 20, 1998, appellant called him wanting him to follow up on a theft complaint she had made March 8, 1998. Appellant had accused Jeffries of stealing $11,000 of her money. Appellant claimed she had paid this amount of money over a period of about two years to Jeffries to pay insurance premiums, but that Jeffries had not applied the money for insurance premiums. Because appellant had not furnished any documentation to support her claim, Toney testified, the investigation was suspended until appellant furnished more evidence.

Nelson Roberts, an agency manager for Allstate Insurance Company, testified that he had been Jeffries's agency manager from May 1996 until Jeffries left the company in

September 1997. Roberts testified that Jeffries's reputation for truth and veracity was bad. Roberts's own opinion of Jeffries had not been influenced by appellant's complaints against Jeffries.

Sergeant Aaron Ard, a DPS officer, testified that in August 1999 he met with appellant. Appellant inquired about having her driver's license number changed. Ard discussed with appellant the documentation necessary for her to have her driver's license number changed. Ard assumed that appellant would return with the necessary documentation to have her driver's license number changed, but she did not return.

In our neutral review of all of the evidence, we do not find that the proof of guilt is so obviously weak as to undermine confidence in the trial court's determination of guilt, or that although adequate if taken alone, is greatly outweighed by contrary proof. Therefore, we hold that the evidence is factually sufficient to support the judgment of the trial court. Appellant's sixteenth point of error is overruled.

In her fifteenth point of error, appellant urges that the judgment should be reversed because the trial court erred in admitting irrelevant hearsay evidence over objection of trial counsel. Appellant argues that the trial court

> erred in admitting evidence in the form of testimony from Michael Canales, over objection of counsel for appellant, that Eric Jeffries as a result of his statement implicating appellant in the burglary case, expressed concern for his safety, that appellant was manipulative, that she would retaliate against him for helping the police and the State, and that his demeanor indicated that he was concerned for his safety.

15

Officer Canales was asked: "And when you took Mr. Jeffries' statement in regard to the burglary, did he express any concern for his safety as a result of that statement?" Canales responded: "Yes, sir, he did." No objection having been made, Canales was then asked: "Specifically, what did he express to you at that time?" Defense counsel objected "on the grounds of relevancy." After hinting that another objection might be appropriate but no other objection being made, the trial court observed the question called for hearsay. However, appellant never objected on that ground. The court stated: "I am going to go ahead and let it in because I will sort it all out. If it's not to be considered, I won't consider it."

To preserve a complaint for appellate review, the record must show that the complaint was made to the trial court by a specific, timely objection and that the trial court either expressly or implicitly ruled on the objection. Tex. R. App. P. 33.1(a)(1), (2). Here the question was asked and answered before counsel objected. The objection was not timely. *See Dinkins v. State*, 894 S.W.2d 330, 355 (Tex. Crim. App. 1995). Counsel untimely objected on the "grounds of relevancy" but on appeal complains of hearsay. The point of error does not comport with her trial objection even if her trial objection had been timely. Because the error complained of on appeal does not comport with the trial objection, the complained of error was not preserved for appellate review. *See McFarland v. State*, 845 S.W.2d 824, 838 (Tex. Crim. App. 1992); *Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990). Furthermore, the trial court's ruling was ambivalent and may be interpreted as sustaining appellant's objection. For these several reasons, the record does not show that the error complained about on appeal, if error, was preserved for appellate review. Appellant's fifteenth point of error is overruled.

In fourteen points of error, appellant contends that her trial counsel was ineffective because counsel:

1. failed to object to inadmissible evidence that appellant allegedly threatened complainant in an unrelated incident;

2. failed to object to inadmissible evidence that appellant had reported that Jeffries had threatened her;

3. failed to object to inadmissible evidence that appellant has asked Jeffries not to testify against her in a prior case;

4. failed to object to inadmissible testimony by Jeffries that appellant had tried to influence him to withhold evidence in a prior case;

5. failed to object to inadmissible testimony that appellant told Jeffries, the complainant and witness, of her plans to commit a burglary;

6. failed to object to inadmissible hearsay evidence from Canales concerning alleged statements made by Jeffries;

7. failed to object to inadmissible testimony from Jeffries concerning appellant's plan to burglarize Jones' residence;

8. failed to object to certain testimony from Canales on the grounds that the admission of the evidence violated the Sixth Amendment;

9. failed to object to inadmissible evidence from Canales concerning a statement made by appellant in a prior case;

10. failed to object to irrelevant testimony of appellant on cross-examination concerning a statement she gave in a prior case;

11. failed to object to inadmissible hearsay evidence of an alleged extraneous act;

12. failed to object to inadmissible irrelevant evidence;

13. elicited damaging inadmissible evidence and opened the door to other damaging evidence;

17

elicited damaging testimony concerning appellant's relationship with Jones.

To show ineffective assistance of counsel, appellant must show that: (1) counsel's performance was deficient, in that counsel made such serious errors that he was not functioning effectively as counsel; and (2) the deficient performance prejudiced the defense to such a degree that appellant was deprived of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986); *Shaw v. State*, 874 S.W.2d 115, 118 (Tex. App. Austin 1994, pet. ref'd); *O'Hara v. State*, 837 S.W.2d 139, 143 (Tex. App. Austin 1992, pet. ref'd). Counsel's performance is to be judged by the "totality of representation" provided. *Strickland*, 466 U.S. at 690; *Butler v. State*, 716 S.W.2d 48, 54 (Tex. Crim. App. 1986). In deciding an ineffective-assistance claim, this Court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct not by hindsight. *Butler*, 716 S.W.2d at 54. We must then determine, in light of all the circumstances, whether the acts or omissions are outside the wide range of professionally competent assistance. *Strickland*, 466 U.S. at 690. Appellant bears a heavy burden to prove his ineffective-assistance claim. *Id.* Counsel is strongly presumed to have provided adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Id*.

By failing to raise the issue of ineffective assistance of counsel in the trial court, appellant did not waive her constitutional right to complain of ineffective assistance of counsel. *See Robinson v. State*, 16 S.W.3d 808, 812 (Tex. Crim. App. 2000). However, rarely will the

18

record on direct appeal be sufficient to prove that counsel's performance was deficient. *Id.* at 813 n.7; *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999).

In determining whether trial counsel's performance was deficient, we do not speculate about counsel's trial strategy. *Blevins v. State*, 18 S.W.3d 266, 271 (Tex. App.–Austin 2000, no pet.); *Mayhue, v. State*, 969 S.W.2d 503, 510 (Tex. App.–Austin 1998, no pet.). Moreover, there is a strong presumption that trial counsel's conduct was within the range of reasonable professional assistance. *Thompson*, 9 S.W.3d at 814. This burden requires the appellant to bring forward a record from which we may discern that trial counsel's performance was not based on sound strategy. *Blevins*, 18 S.W.3d at 271. Without an evidentiary hearing, either on a motion for new trial or on a collateral attack on the judgment, rarely can it be shown that counsel's performance was not based on sound strategy.

This is not the rare case. Nothing in this record reveals counsel's trial strategy in regard to his alleged deficient performance. Although we do not speculate on counsel's strategy, in this case, the trier of fact had to determine whether the testimony of the complainant or the appellant was more credible. There is testimony in the record that the reputation of both the appellant and the complainant is such that neither was worthy of belief. Perhaps trial counsel believed that all of the evidence about their relationship would convince the trier of fact that appellant's testimony was more credible. That trial counsel's strategy was not successful is not the test of whether he rendered effective assistance of counsel. Examination of the record on direct appeal fails to show that trial counsel's performance was not based on sound trial strategy.

19

We hold that appellant has not overcome the strong presumption that her trial counsel's strategy was reasonable. We overrule appellant's points of error in which she claims she did not receive effective assistance of counsel.

In her seventeenth point of error, without further argument or citation of authority, appellant contends that "harm is established by the cumulative impact of the errors." A point of error based upon the cumulative effect of the errors is not a proper point of error, and presents nothing for review. *Stoker v. State*, 788 S.W.2d 1, 18 (Tex. Crim. App. 1989); *Hollis v. State*, 509 S.W.2d 372, 375 (Tex. Crim. App. 1974); *Amis v. State*, 910 S.W.2d 511, 520 (Tex. App.—Tyler 1995, pet. ref'd); *Lape v. State*, 893 S.W.2d 949, 953 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd); *McDuffie v. State*, 854 S.W.2d 195, 220 (Tex. App.—Beaumont 1993, pet. ref'd). Appellant's seventeenth point of error is overruled.

The judgment of the trial court is affirmed.

_____

Carl E. F. Dally, Justice

Before Chief Justice Aboussie, Justices Patterson and Dally[*]

Affirmed

Filed: February 8, 2001

Do Not Publish

20

\* Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).