COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NOS. 2-02-159-CR
2-02-160-CR

   
JEFFREY PAUL HALE                                                             APPELLANT
 
V.
 
THE STATE OF TEXAS                                                                  STATE
  
------------
 
FROM CRIMINAL DISTRICT COURT 
NO. 4 OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
        Appellant, 
Jeffrey Paul Hale, appeals from his conviction for two counts of 
fondling/indecency with a child and one count of aggravated sexual assault of a 
child. In two points, appellant argues that he received ineffective assistance 
of counsel and that the trial court erred by excluding evidence that two of the 
alleged victims had engaged in prior sexual conduct with each other. We affirm 
the trial court’s judgments.
FACTS
        Appellant 
attended the Door of Hope Church in Arlington, Texas. Appellant met J.S., a 
twelve-year-old boy, and J.S.’s mother through the church. J.S.'s mother 
arranged for appellant to mentor J.S. Although J.S.'s mother and appellant 
initially intended appellant to mentor only J.S., she also got appellant 
involved with J.S.’s brothers, including her stepson R.D.
        During 
their first meeting in 1998, appellant took J.S. and his brother J. to lunch. On 
the next visit, appellant took J.S. to his apartment to watch a movie and spend 
the night. J.S. was alone with appellant during this visit. J.S. testified that 
appellant fondled his penis while they were watching a movie. After being 
fondled, J.S. got up and went to appellant’s bedroom and fell asleep. Later 
that night, J.S. woke up because appellant was “messing with [his] penis” 
and trying to masturbate him. J.S. panicked, moved away from appellant, zipped 
up his pants, and told appellant to leave him alone.
        Early 
the next day, J.S. woke up and went to the bathroom. When he returned, appellant 
pulled him down onto the bed, rolled him onto his chest, and pulled down his 
pants. Appellant put his penis in J.S.’s anus and moved up and down on top of 
him until he ejaculated. According to J.S., appellant threatened to hurt his 
family if J.S. told anyone what had happened.
        J.S.’s 
stepbrother R.D. also testified against appellant. R.D. testified that he went 
with appellant the second time appellant went out with J.S. During one visit to 
appellant’s apartment, R.D. and appellant were watching television when 
appellant began kissing R.D. on the cheek and the lips. Appellant unbuttoned 
R.D.’s pants and began rubbing his penis.
        R.D. 
and J.S. also spent the night at appellant’s apartment during other visits. On 
those occasions, appellant would sleep in the bed with the boys. While in bed, 
appellant would kiss R.D. Appellant also tried to put R.D.’s hand on 
appellant’s penis.
        Accusations 
against appellant came to light when J.S. sexually assaulted his three-year-old 
brother in the shower by forcing his penis between his brother’s legs and into 
his brother’s anus. The three-year-old told a neighbor what happened, and the 
neighbor then told J.S.’s mother. In response, J.S.’s mother asked him if 
anyone had ever done anything similar to him. It was then that J.S. first told 
his mother that appellant had assaulted him. At trial, J.S.’s credibility was 
attacked, and he admitted to lying to the Child Protective Services (CPS) worker 
and his mother about assaulting his little brother.
        While 
R.D. was on the stand, the defense attempted to elicit testimony concerning 
sexual activity between the two boys (J.S. and R.D.). Outside the presence of 
the jury, R.D. testified that sexual activity was going on between his 
stepbrother (J.S.) and himself. Specifically, he said that he and J.S. were 
having oral sex and were doing “penises to the buttocks type stuff” with 
each other for years. R.D. confirmed that after J.S. assaulted his little 
brother, J.S.'s mother called and asked him about the nights he spent at 
appellant’s and things that had happened between J.S. and him. R.D. did not 
clarify whether he was referring to things that happened between he and 
appellant or he and J.S. The trial court disallowed R.D.’s testimony relating 
to his sexual activity with his stepbrother.
        The 
last witness called by the State during the guilt-innocence phase of trial was 
Brandon Williams. Williams was the pastor of the Door of Hope Church when the 
boys first accused appellant of assaulting them. Williams testified that 
although appellant attended his church, he never became an official member. He 
also denied that the church recommended appellant as an official mentor for J.S., 
claiming that J.S.'s mother and appellant made the arrangements on their own. At 
some point, Williams received a three-way call from J.S.'s mother and R.D.’s 
mother alleging that appellant had sexually abused their sons. Approximately 
four days later, Williams called appellant on his cell phone and informed him 
that allegations of sexual abuse had been made against him. According to 
Williams, appellant began to say “Oh my God, oh my God” over and over again. 
Appellant then told Williams that one evening while the boys were at his home, 
he heard them making some noise in the other room, and when he went to 
investigate, he saw the boys “messing with each other” or “playing with 
each other.” Williams asked appellant whether he had ever done anything he 
should not have done to the boys. After a moment, appellant answered that he 
touched them once. Williams warned appellant that no privilege attached to their 
discussion, that he would have to report the allegations, and that appellant 
should retain an attorney.
        Williams 
also testified about occasions when appellant babysat with his children. He 
stated that on the last occasion that appellant babysat for his family in 
February 1999, he and his wife felt uneasy about appellant staying with their 
children. Although Williams inquired, none of the his children ever made any 
allegations of sexual abuse against appellant.
        At 
the guilt-innocence stage of trial the defense called only one witness, J.S.’s 
mother, to testify about the sexual relationship between J.S. and R.D. However, 
the trial court sustained the State’s objection to her testimony after she 
testified outside the presence of the jury. The jury never heard her testimony. 
The jury found appellant guilty on all counts.
        During 
the punishment phase of trial, the State presented seven witnesses. The defense 
did not present any witnesses. The first to testify for the State was Joan 
Morais. She met appellant through her son when he attended the First Baptist 
Church in Dayton. She had known appellant for eleven years. Appellant approached 
Morais for help in forming Child Heart Ministries. Once the ministry was formed, 
Morais served as a member of the board along with Janet Harrelson (appellant's 
mother), Randy Piatt, Molly Plant, and Ted Plant. The goal of the ministry was 
to help get children off the street, find homes for them, and introduce them to 
God.
        Because 
Morais was well connected in the country of El Salvador, appellant asked her to 
help him arrange a visit to El Salvador because he thought it would be a good 
place to begin his ministry. Morais put appellant in contact with her 
husband’s cousin, Olga Miranda, who lived there. While in El Salvador, 
appellant met several boys on the street and found them places to live. 
Appellant even brought two boys (ages ten or eleven) back to Dayton where they 
stayed with him at his mother’s house. Appellant hoped to adopt one of them, 
but was unable.
        Sometime 
after the ministry began, Morais received a phone call from Randy Piatt who told 
her that appellant had left El Salvador and that the ministry was to be 
dissolved. Morais then received a call from Olga Miranda who was upset with 
Morais for sending someone like appellant to her country. Morais learned from 
Miranda that appellant fled from El Salvador because he had allegedly molested 
some boys and that he would be arrested if he ever returned.
        Piatt 
was the second witness to testify for the State. He was the pastor of the First 
Baptist Church in Dayton and had known appellant since appellant was five years 
old. Piatt testified that appellant came to his office after abruptly leaving El 
Salvador. Appellant told Piatt that he had gotten in trouble with the law 
because he had fondled the genitals of some of the young boys in El Salvador. 
Appellant stated that if he returned to El Salvador he would be arrested and he 
feared the United States would extradite him. Piatt recommended that appellant 
leave the childrens’ ministry and return to school.
        Next, 
the State called Dennis Johnson. Johnson was a Baptist missionary who met 
appellant while he and his family were furloughed in Arlington, at the Door of 
Hope Church in 1996. Johnson and his wife had four children (three boys and one 
girl). Appellant seemed particularly fond of A.J. and his brother (two of 
Johnson's sons) and lavished them with gifts. Appellant visited the Johnson 
family in Mexico City several times and stayed in their home. During one visit, 
appellant asked if A.J. could sleep in his room with him and Johnson said 
“no.” At one point, Johnson decided to talk to his boys about possible 
sexual abuse because of accusations against a youth minister that the boys knew. 
During that discussion, A.J. told his father that appellant had fondled him and 
touched him in a sexual manner while visiting the family in Mexico City.
        A.J. 
testified next and corroborated his father’s testimony. A.J. testified that 
when he and his brother slept over at appellant’s house, all three slept in 
appellant’s bed together with appellant in the middle. One night, appellant 
put his hand into A.J.’s pants and began touching his penis. On another 
occasion when A.J. was eight, he and his brother spent the night with appellant 
at a friend’s house in Mexico City. Appellant slept in the middle between the 
two brothers. During the night, appellant began kissing A.J. on the lips and 
touched his penis.
        Next, 
the State called Barry Smith who owned two foster homes in the country of 
Belize. Appellant met Smith while working at an orphanage in Belize and 
eventually came to work for Smith at one of his foster homes. Smith testified 
that he had problems with appellant sleeping with the young boys. Appellant 
would sleep with the boys in the same bed and wrap his arms around them from 
behind. Although Smith spoke to appellant about this practice, appellant refused 
to stop sleeping with the boys even though he had his own bed. After appellant 
left the home, Smith spoke to the boys, specifically G.C. G.C. was twelve at the 
time and testified that he told Smith that appellant fondled his penis.
        Janice 
Gooch was the last witness to testify for the State during the punishment phase. 
She testified that appellant started Foundation Amistad in Columbia to help 
street children and that she contributed to his cause. Although appellant told 
her about the allegations of sexual abuse, saying that he was involved in an 
“incident,” she stated that she believed appellant was innocent and had no 
problem with him being around her children.
        The 
trial court sentenced appellant to ten years’ imprisonment for each count of 
indecency with a child/fondling and forty years’ imprisonment for aggravated 
sexual assault of J.S., the sentences to run concurrently. After sentence was 
imposed, appellant retained new defense counsel who filed a motion for new trial 
alleging ineffective assistance of counsel.
        At 
the hearing on the motion for new trial, appellant’s new counsel presented 
testimony from witnesses who said that they would have been willing to testify 
for appellant at trial had they been asked. Most witnesses testified generally 
about appellant and his good character. However, some testified to witnessing 
appellant interact with the victims in the case.
        Debbie 
Joines testified first on appellant’s behalf. She knew appellant through the 
Door of Hope Church in Arlington. Appellant’s trial lawyers never contacted 
Joines either before or during appellant’s trial. She stated that if she had 
been called to testify for appellant, she would have provided evidence that 
appellant was listed in the church directory as a member of the Door of Hope 
Church. This testimony would have contradicted the guilt-innocence testimony of 
Brandon Williams who testified that appellant had never joined the church. 
Joines also testified that she and appellant were both present at a church 
meeting where the attendees discussed finding a suitable mentor for J.S.
        Flavio 
Ferreira, a friend of appellant’s from Brazil, also testified that he was not 
contacted by any of appellant’s trial lawyers either before or during 
appellant’s trial. Had he been called to testify for appellant, he would have 
testified that he stayed at appellant’s apartment in December of 1998. While 
there, two boys, approximately ages nine and thirteen, visited appellant’s 
apartment. Ferreira noted that the boys were comfortable around appellant and 
that appellant did nothing inappropriate to the boys while he was visiting. 
Ferreira visited appellant again in the summer of 1999 and stayed at his 
apartment for a month. No boys spent the night during this visit.
        Ronald 
Maurice testified that appellant’s trial counsel never contacted him before or 
during the trial. If called to testify, he would have been able to testify to 
appellant’s demeanor while they worked at an orphanage in El Salvador. In 
1996, Maurice observed appellant working with children at an orphanage three to 
four times a week over the course of a month. The children all seemed 
comfortable with appellant, and Maurice never observed appellant do anything 
inappropriate to the children. Maurice actually helped appellant bathe some of 
the children.
        At 
another time, appellant and Maurice drove supplies to El Salvador together. 
While there, they stayed at an orphanage for three to four days. The orphanage 
housed only boys, and Maurice never saw appellant act inappropriately with them. 
He also never noticed that the boys were scared or uncomfortable around 
appellant. Maurice never saw appellant sleep in the same bed with any of the 
boys. Overall, Maurice considered appellant to have excellent character.
        Appellant’s 
trial counsel interviewed appellant’s roommate Argelio Bolanos, but decided 
that it was best for him not to testify. Bolanos testified at the hearing, 
however, that there were several subjects he could testify to that were 
favorable to appellant that trial counsel failed to ask him about during the 
interview. Appellant and Bolanos were roommates from November 1997 through June 
1999. Bolanos testified that he met J.S. at the Door of Hope Church while 
attending church with appellant. Bolanos stated that J.S. spent the night at 
appellant’s apartment two to three times during late 1998 and early 1999.
        Bolanos 
described how appellant’s bedroom was not very private because the door never 
closed completely and always stayed open approximately six inches. He testified 
that when J.S. slept over he slept on a mat on the floor of appellant’s 
bedroom that could be seen through the crack in the door. He also described the 
blinds in appellant’s bedroom, noting that there was a gap on all sides of the 
blinds, which allowed a person standing outside the bedroom to look through. 
Bolanos stated that appellant’s original trial lawyers never asked him about 
the lack of privacy in appellant’s bedroom.
        Bolanos 
further testified that R.D. stayed overnight at appellant’s in May or April of 
1999. That night Bolanos came home at approximately 10:30 p.m. and found R.D. 
sleeping on the couch and J.S. sleeping on the floor mat in appellant’s room. 
Bolanos never saw appellant act inappropriately with J.S. or R.D. and noted that 
they always seemed at ease around appellant.
        Bolanos 
also accompanied appellant to the Johnson home. When they arrived at the 
Johnson’s, the children were excited to see appellant, did not act threatened, 
and Bolanos said he never saw appellant act inappropriately toward any of the 
children. Appellant’s former trial lawyers, however, never asked Bolanos about 
the Johnson family.
        Bolanos 
also helped appellant babysit Brandon Williams’s children on Valentine’s Day 
in 1999. While babysitting, Bolanos never saw appellant do anything 
inappropriate with the children, nor did he see the children act in a manner 
that would indicate that they were scared or apprehensive around appellant. When 
the Williams returned from dinner, Bolanos noted that they did not seem uneasy. 
On the contrary, Bolanos testified that they were appreciative and thanked 
appellant for taking care of the children. Although Bolanos told appellant’s 
former trial counsel about babysitting the Williams children, no one ever 
followed up or interviewed him on the subject again.
        Appellant’s 
former trial counsel testified at the hearing, stating that they chose not to 
call Bolanos as a witness because his testimony would have shown that he 
regularly went to prayer group meetings on the same two nights every week and 
often would spend the night at his mother’s or aunt’s house on those 
evenings. Appellant and his counsel made a strategy decision not to call Bolanos 
because they feared that his testimony would ultimately have helped the 
State’s case because it would have shown that appellant was routinely alone in 
the apartment on certain days every week. At the hearing on the motion for new 
trial, Bolanos testified that he never told appellant’s counsel that he often 
slept somewhere other than at appellant’s apartment. Bolanos clarified, 
stating that he told appellant’s trial counsel that he often came home late 
after prayer meetings, but that he never told appellant when he could be 
expected to return home.
        Appellant’s 
trial attorneys also testified that the decision not to call any witnesses to 
testify at the guilt-innocence and punishment stages was a strategy decision. 
The attorneys and appellant together decided that it was best if appellant did 
not testify on his own behalf because appellant was worried that he might say 
the wrong thing and open the door to issues that he did not want to come out. 
During trial, counsel asked appellant if he would consider testifying, and 
appellant sent them a note saying that he would not.
        With 
regard to the punishment phase, appellant’s trial counsel decided that instead 
of calling witnesses, they would have the witnesses submit affidavits to the 
officer conducting the Pre-Sentence Investigation. Appellant agreed to the 
strategy after a lengthy discussion with his attorneys regarding the fact that 
any witness that took the stand would be subject to cross-examination. Appellant 
did not want any of his friends or family subject to cross-examination and 
agreed that it would be better for the witnesses to submit affidavits.
        In 
preparation for their case, appellant’s trial counsel relied heavily on the 
State’s open file policy and an oral agreement with the prosecution regarding 
notice of plans to introduce extraneous offenses. Attorney Don Turner was first 
retained by appellant on his case in the summer or the fall of 1999. Turner 
hired an investigator, but the investigator had little success because the 
people he found were unwilling to talk to him about appellant’s case. Turner 
said that he interviewed appellant approximately twenty times in person and had 
numerous phone conversations with him. Turner testified that the decision not to 
call witnesses was a strategy decision that he, appellant’s other trial 
counsel, and appellant made together after discussing the pros and cons of 
exposing witnesses to cross-examination.
        Appellant 
also retained attorney Robert Bush approximately two to three months before 
trial. Bush did not interview any possible witnesses except for Bolanos and 
appellant. Bush further corroborated Turner’s testimony regarding the strategy 
decision not to call any witnesses in light of appellant’s decision not to 
testify on his own behalf. After the guilt-innocence phase of trial, appellant 
wrote his trial attorneys a letter complimenting them on their professionalism, 
stating that they were very good at what they do, and thanking them for their 
hard work on his case.
        Appellant’s 
mother Janet Harrelson also testified at the hearing on the motion for new 
trial. She testified that appellant called her after he allegedly confessed to 
Brandon Williams. Appellant told her about the accusations of sexual abuse. He 
stated that Williams had asked him whether he had touched the boys, and 
appellant had said “yes, I have” but that Williams cut him off before he 
could explain that the touching was not in a sexual way.
        Harrelson 
also testified that she was present during the meeting with Piatt where 
appellant allegedly confessed to the allegations of abuse that occurred in El 
Salvador. Harrelson stated that she never heard appellant confess. She also 
related her observations of appellant with J.S., the Johnson family, and the 
Williams family. Whenever appellant and his mother ran into any of them, both 
the children and their parents seemed happy to see appellant and would greet him 
warmly.
        Harrelson 
also visited appellant while he was working at the children’s home in Belize. 
While there, she saw nothing to indicate that G.C. was scared or uncomfortable 
around appellant. She also allowed appellant and the two young boys from Belize 
to stay in her home while they were visiting appellant. She never saw appellant 
do anything inappropriate with the boys. Appellant’s former trial counsel 
never questioned her about information relating to the boys from Belize.
INEFFECTIVE ASSISTANCE OF COUNSEL
        First, 
Appellant complains that his trial counsel was ineffective, thereby depriving 
him of his Sixth Amendment right to counsel. Strickland v. Washington 
sets out the standard for appellate review of trial counsel’s effectiveness 
during the guilt-innocence and punishment phases of a non-capital trial. 466 
U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). The standard was adopted by the 
Texas Court of Criminal Appeals in Hernandez v. State, 988 S.W.2d 770, 
770 (Tex. Crim. App. 1999). We apply a two-pronged test to ineffective 
assistance of counsel claims. Strickland, 466 U.S. at 687, 104 S. Ct. at 
2064; Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999); Hernandez, 
988 S.W.2d at 770. First, appellant must show that his counsel's performance was 
deficient; second, appellant must show the deficient performance prejudiced the 
defense. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; Hernandez, 
988 S.W.2d at 770.
        In 
evaluating the effectiveness of counsel under the first prong, we look to the 
totality of the representation and the particular circumstances of each case. Thompson, 
9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under 
all the circumstances and prevailing professional norms at the time of the 
alleged error. Strickland, 466 U.S. at 688-89, 104 S. Ct. at 2065. 
“[C]ounsel is strongly presumed to have rendered adequate assistance and made 
all significant decisions in the exercise of reasonable professional 
judgment.” Id. at 690, 104 S. Ct. at 2066. An allegation of ineffective 
assistance must be firmly founded in the record, and the record must 
affirmatively demonstrate the alleged ineffectiveness. Thompson, 9 S.W.3d 
at 814. Our scrutiny of counsel's performance must be highly deferential, and 
every effort must be made to eliminate the distorting effects of hindsight. Strickland, 
466 U.S. at 689, 104 S. Ct. at 2065.
        The 
second prong of Strickland requires a showing that counsel's errors were 
so serious that they deprived the defendant of a fair trial, i.e., a trial whose 
result is reliable. Id. at 687, 104 S. Ct. at 2064. In other words, 
appellant must show there is a reasonable probability that, but for counsel's 
unprofessional errors, the result of the proceeding would have been different. Id. 
at 694, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient 
to undermine confidence in the outcome. Id. The ultimate focus of our 
inquiry must be on the fundamental fairness of the proceeding whose result is 
being challenged. Id. at 697, 104 S. Ct. at 2070. A claim of ineffective 
assistance of counsel must be proven by a preponderance of the evidence, and the 
burden is on the defendant to prove his claim. See Rylander v. State, 101 
S.W.3d 107, 110 (Tex. Crim. App. 2003); Bone v. State, 77 S.W.3d 828, 833 
(Tex. Crim. App. 2002).
        An 
ineffective assistance of counsel claim may properly be raised in a motion for 
new trial. Where a timely and adequate motion for new trial, supported by 
affidavit and raising matters not shown by the record, is presented to the trial 
court, the trial court must hold a hearing on the motion. Reyes v. State, 
849 S.W.2d 812, 814-16 (Tex. Crim. App. 1993). In the case at bar, appellant’s 
counsel first raised the ineffective assistance claim in a motion for new trial. 
The trial court denied appellant’s motion. However, his appeal is not based 
upon the trial court’s denial of his motion for new trial. Appellant brings 
his appeal based upon the constitutional right to effective assistance of 
counsel solely under the Sixth Amendment. Even so, the State argues in its brief 
that the trial court’s decision to deny appellant’s motion for new trial 
should be reviewed under an abuse of discretion standard.
        Although 
we agree that the State’s argument is correct with regard to a denial of a 
motion for new trial, it is not applicable to this appeal because appellant does 
not complain of the trial court’s decision to deny his motion for new trial. 
Appellant brings his appeal on constitutional grounds. As such, it is not 
necessary that a defendant raise his ineffective assistance claim at trial or in 
a motion for new trial in order to raise it on appeal. Robinson v. State, 
16 S.W.3d 808, 809-11 (Tex. Crim. App. 2000). Therefore, we hold that appellant 
did not waive his complaint of ineffective assistance of counsel and it is 
properly brought for the first time on appeal. As we noted above, we apply the 
two-prong standard of review under Strickland v. Washington to claims of 
ineffective assistance of counsel under the Sixth Amendment.
        Appellant’s 
complaints about the effectiveness of his trial counsel center around his 
attorneys’ failure to investigate witnesses whose names were given to them by 
appellant. During the hearing on the motion for new trial, appellant’s former 
trial counsel established on the record that they did not call any witnesses 
because they were concerned about the nature of the testimony that would develop 
at trial.
Guilt-Innocence Phase of Trial
        With 
regard to the guilt-innocence phase, appellant’s counsel failed to interview 
Joines and Harrelson concerning whether appellant was indeed a member of the 
Door of Hope Church and whether the church had requested that appellant serve as 
a mentor to J.S. Appellant argues that had Harrelson or Joines testified, their 
testimony would have impeached Williams’s testimony on these issues. 
Additionally, Harrelson could have clarified appellant’s alleged phone 
confession to Williams regarding the abuse allegations. Appellant contends that 
Harrelson’s testimony concerning appellant’s statements would have been 
admissible as excited utterances and directly contradicted Williams’s 
testimony that appellant made an admission.
        Ferreira, 
Harrelson, and Bolanos could have testified during guilt-innocence regarding 
appellant’s interaction with J.S. and R.D. All three testified that the boys 
seemed comfortable around appellant and that appellant never did anything 
inappropriate to the boys. However, none of these witnesses could testify to the 
facts surrounding the alleged acts of sexual abuse. None of appellant’s 
proposed witnesses could provide an alibi or alternate version of the facts 
surrounding the boys’ allegations. Bolanos was the only witness that had 
potential to be a fact witness, but appellant’s attorneys ultimately decided 
that he was a character witness. Overall, appellant’s trial counsel determined 
that all of appellant’s proposed witnesses could only be offered as character 
witnesses. In this capacity, the witnesses would be subject to impeachment using 
“have you heard” or “did you know” questions on extraneous offenses. 
Appellant’s counsel decided that more harm than good would come out of the 
testimony of these witnesses.
        Appellant 
argues that his case is analogous to Butler v. State where the court of 
criminal appeals held that defense counsel’s failure to interview potential 
eyewitnesses fell below the objective standard of reasonableness. 716 S.W.2d 48, 
56 (Tex. Crim. App. 1986). However, appellant ignores the fact that in Butler 
the witnesses were eyewitnesses to part of the crime and an alibi witness who 
lived with the defendant. Id. at 51-53. The eyewitnesses both testified 
at the hearing on the motion for new trial that the defendant was not the man 
who robbed the convenience store on the day in question. Id. at 51-52. 
The alibi witness lived with the defendant and testified at the hearing that at 
the time of the robbery the defendant was in the apartment with her. Id. 
Additionally, the defense counsel failed to present evidence that would have 
corroborated the defendant’s testimony that he was on the phone with his 
sister near the time of the robbery. Id. at 52. The phone records were 
easily accessible, and the defendant’s sister was willing to testify to the 
fact that she spoke to the defendant on that morning. Id.
        Butler’s 
defense counsel argued that they did not call eyewitness Sergeant Williams 
because they were afraid that he would be impeached by the police reports. Id. 
at 56. The court stated that fear of impeachment was not a justification for not 
interviewing the witness at all. Id. Defense counsel could not articulate 
a reason for its failure to call the alibi witness or other eyewitness to the 
robbery. Id. at 55-56. Ultimately, the court held that the defense 
counsel had failed both prongs of the Strickland test, affirmed the 
decision of the court of appeals, and remanded the case for a new trial. Id. 
at 57.
        In 
the present case, appellant’s trial counsel failed to interview potential 
witnesses who could have testified favorably for appellant during the trial. 
However, the present case can be distinguished from Butler because none 
of appellant’s potential witnesses had any personal information concerning the 
accusations made by the two victims. None of appellant’s proposed witnesses 
could provide an alibi or an eyewitness account of what occurred between 
appellant and the victims. At best, some of the witnesses could offer testimony 
on their personal observations of appellant interacting with the victims on 
other occasions and statements to the effect that nothing inappropriate occurred 
while the witnesses were present.
        Appellant 
also argues that the present case is analogous to Ex Parte Duffy, 607 
S.W.2d 507, 508-09 (Tex. Crim. App. 1980), overruled by Hernandez v. 
State, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999). However, Duffy has 
since been overruled by the Texas Court of Criminal Appeals in Hernandez 
where it held that both prongs of the Strickland test are applicable to 
ineffective assistance of counsel claims alleging a deficiency of attorney 
performance at noncapital sentencing proceedings. Hernandez, 988 S.W.2d 
770, 772. Therefore, to the extent that appellant relies upon the standard in Duffy, 
we decline to follow his contentions and apply the Strickland standard to 
both the guilt-innocence and punishment stages of trial. See id.
        In 
support of appellant’s claim that his trial counsel failed to investigate and 
call witnesses on his behalf, appellant relies on the witness testimony 
previously summarized and on affidavits presented with his motion for new trial. 
However, both of appellant’s trial counsel testified at the hearing that 
appellant specifically requested that he did not want any of the potential 
witnesses he had named to be subject to cross-examination. Appellant disagrees 
and in his affidavit states that he provided his trial attorneys with the names 
of many witnesses who could have testified on his behalf and did not understand 
why his attorneys would not interview them.
        The 
reviewing court must indulge a strong presumption that counsel’s performance 
falls within the wide range of reasonable professional assistance. Strickland, 
466 U.S. at 690, 104 S. Ct. at 2066. The appellant must overcome the presumption 
that, under the circumstances of the case, the contested actions may be 
considered sound trial strategy. Id. Strategic and tactical decisions are 
virtually unchallengeable when made after thorough investigation of the facts 
and law. Id. “[S]trategic choices made after less than complete 
investigation are reasonable precisely to the extent that reasonable 
professional judgments support the limitations on investigation.” Id. at 
690-91, 104 S. Ct. at 2066.
        Appellant’s 
former trial counsel prepared for appellant’s case by interviewing appellant 
twenty times in person and numerous times over the phone. The attorneys 
interviewed appellant’s roommate and decided that it would be harmful to the 
defense if Bolanos testified. Both attorneys reviewed the entire State’s file 
consisting of witness statements, police records, CPS records, grand jury 
summaries, appellant’s school records, medical records for J.S., and divorce 
records.
        Appellant’s 
former counsel also testified that the decision not to call appellant’s 
suggested witnesses was a strategy decision made by counsel and appellant so 
that they could avoid exposing the witnesses to cross-examination and “have 
you heard” questions concerning extraneous offenses. At guilt-innocence, 
impeachment questions concerning the allegations of abuse in El Salvador and by 
A.J. could have been particularly damaging to appellant’s case.
        The 
decision by appellant’s trial counsel not to call the potential witnesses 
during the guilt-innocence phase of trial was based upon sound trial strategy. 
Moreover, there was no need for appellant’s trial counsel to interview 
additional character witnesses for the guilt-innocence phase because counsel and 
appellant had decided not to expose any of the potential witnesses to 
cross-examination. Appellant has not overcome the presumption that, under the 
circumstances, the decision not to investigate witnesses further might be 
considered sound trial strategy. Thus, we hold that the performance of 
appellant’s trial counsel was not deficient during the guilt-innocence phase 
of trial. Having held that counsels’ performance was not deficient under the 
first prong of Strickland, we need not reach the second prong with regard 
to the guilt-innocence phase of trial.
Punishment Phase of Trial
        As 
we noted above, the court of criminal appeals in Hernandez v. State 
extended the Strickland test to apply to ineffective assistance of 
counsel claims at the punishment phase of trial in non-capital cases. Hernandez, 
988 S.W.2d at772. With regard to the punishment phase of trial, appellant argues 
that Maurice, the co-worker in El Salvador, could have testified about 
appellant’s activities there. However, appellant ignores the fact that Maurice 
was not with him at all times while he was in El Salvador. Although Maurice 
could testify regarding his observations of appellant innocently interacting 
with the children while in Maurice’s presence, he was without personal 
knowledge about the specific circumstances surrounding the allegations of abuse. 
Additionally, Maurice was unable to provide an alibi or other explanation for 
the allegations of abuse.
        Harrelson’s 
testimony at the motion for new trial hearing contradicted Piatt’s claim that 
appellant admitted fondling young boys in El Salvador. She claimed that she was 
present during the meeting and that appellant never made the admission as Piatt 
claimed he did. Harrelson’s testimony also relates to the testimony of G.C. 
and the Johnsons in that she claims she personally saw appellant interact with 
G.C. and A.J. and that neither indicated that they were uncomfortable around 
appellant. However, Harrelson was not personally present during any of the 
instances of alleged abuse. The weight of Harrelson’s testimony also must be 
weighed against the fact that she is appellant’s mother and could have been 
impeached on the basis of bias or prejudice.
        The 
proposed witnesses that appellant provided his attorneys were primarily 
character witnesses. The few who might have at one point provided information 
that could have been used for impeachment were no longer needed because the 
primary witness, J.S., admitted to lying. Specifically, J.S. admitted on the 
stand that he had sexually assaulted his younger brother and had lied about it 
on more than one occasion. Since he had admitted lying, any witnesses that could 
testify to the contradictory statements would not be needed.
        Both 
of appellant’s former trial attorneys testified that the decision not to call 
any witnesses to testify at the guilt-innocence and punishment stages were 
strategy decisions. Additionally, the attorneys and appellant decided that it 
was best if appellant did not testify on his own behalf because appellant was 
worried that he might say the wrong thing and open the door to issues that he 
did not want to come out. When asked during trial whether he would consider 
testifying, appellant unequivocally stated that he would not. With regard to 
character witnesses, appellant’s trial counsel decided that instead of calling 
them to testify they would have the witnesses submit affidavits to the officer 
conducting the Pre-Sentence Investigation. Appellant agreed to this strategy 
after a lengthy discussion with his attorneys because he was concerned that any 
witness that took the stand would be subject to cross-examination and possibly 
harm his case. Appellant clearly indicated to his counsel that he did not want 
any of his friends or family subject to cross-examination.
        Because 
appellant decided to submit affidavits to the Pre-Sentence Investigation officer 
instead of calling witnesses and clearly indicated to his attorneys that he did 
not want any of his proposed witnesses subjected to cross-examination, the 
decision by appellant and his trial counsel not to call the potential witnesses 
during the punishment phase of trial was based upon sound trial strategy. 
Moreover, there was no need for appellant’s trial counsel to interview 
additional character witnesses for punishment because counsel and appellant had 
decided not to expose any of the potential witnesses to cross-examination. 
Appellant has not overcome the presumption that, under the circumstances, the 
decision not to investigate witnesses further or call them during the punishment 
phase was sound trial strategy. Thus, we hold that the performance of 
appellant’s trial counsel was not deficient during the punishment phase of 
trial. Having held that counsels’ performance was not deficient under the 
first prong of Strickland, we need not reach the second prong. 
Accordingly, we overrule appellant’s first point.
EXCLUSION OF EVIDENCE
        In 
his second point, appellant complains that the trial court erred by excluding 
evidence that J.S. and R.D. had been having sex with each other prior to the 
alleged assault committed by appellant. Appellant argues that the State opened 
the door to this line of evidence. As set out above, R.D. testified about the 
phone call from J.S.'s mother where they discussed the allegations against 
appellant. The conversation demonstrated that neither J.S. nor R.D. told anyone 
about the abuse until after J.S. was caught sexually assaulting his 
three-year-old brother.
        On 
direct examination, R.D. stated that J.S.'s mother called while very upset and 
“she . . . asked . . . about the nights that–at [appellant]’s and about 
things that happened between [J.S.] and I and what was happening and stuff.” 
Outside the presence of the jury, the defense elicited testimony from R.D. that 
sexual activity was going on between his stepbrother (J.S.) and himself. 
Specifically, he said that he and J.S. were having oral sex and were doing 
“penises to the buttocks-type stuff” with each other for years. R.D. also 
confirmed that J.S.'s mother had indeed asked him about what was going on 
between he and J.S. The trial court excluded the proffered testimony.
        At 
trial, appellant argued that the excluded evidence, including the evidence of 
the victims’ prior sexual conduct, was admissible under the rules of evidence 
to show the victims’ motive to lie. As an appellate court, we review the trial 
court’s decision to admit or exclude evidence under an abuse of discretion 
standard. See Green v. State, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 
1996), cert. denied, 520 U.S. 1200 (1997); Montgomery v. State, 
810 S.W.2d 372, 379-80 (Tex. Crim. App. 1990). Therefore, we will not reverse a 
trial court as long as its ruling was within the “zone of reasonable 
disagreement.” Green, 934 S.W.2d at 102; Montgomery, 810 S.W.2d 
at 391 (op. on reh'g).
        Appellant 
argues that this evidence was relevant as an alternative basis of information to 
explain how J.S. and R.D. were so knowledgeable about sexual matters. Because 
the average child would not be expected to explain sexual matters so explicitly, 
appellant argued that without information concerning sexual conduct between J.S. 
and R.D., the jury would infer that the boys could not have known about these 
sexual acts unless appellant performed them on the boys. The trial court held 
that the evidence was irrelevant and denied appellant’s request.
        On 
appeal, the State argues that this evidence was inadmissible under rule 412 of 
the Texas Rules of Evidence, the rape shield statute. This rule excludes 
evidence of specific instances of an alleged victim’s past sexual conduct in a 
trial for aggravated sexual assault unless the evidence falls within one of 
several enumerated categories set out in rule 412(b)(2). Tex. R. Evid. 412(b)(2). Evidence of 
specific instances of an alleged victim’s past sexual behavior is only 
admissible if it is evidence (1) to rebut or explain scientific or medical 
evidence offered by the State, (2) of past sexual behavior with the accused, 
offered on the issue of consent, (3) that relates to the motive or bias of the 
alleged victim, (4) that is admissible under rule 609, or (5) that is 
constitutionally required to be admitted. Id.
        No 
evidence in the record, or offered outside the jury’s presence, suggests that 
the boys were biased or motivated to lie about the assault. Additionally, the 
vague reference to sexual conduct between R.D. and J.S. during the testimony of 
R.D., where he stated that J.S.'s mother had called him to ask about “things 
that happened between [J.S.] and I and what was happening and stuff,” cannot 
be construed as opening the door to otherwise inadmissable evidence. The trial 
court stated in the record that it believed that R.D.’s testimony did not 
specifically refer to conduct between R.D. and J.S.
        A 
number of states have held that the United States Constitution compels the 
admission of evidence to show an alternative basis for a child victim’s 
knowledge of sexual matters. See, e.g., State v. Dodson, 580 
N.W.2d 181, 191 (Wis. 1998); State v. Budis, 593 A.2d 784, 791 (N.J. 
1991); Commonwealth v. Ruffen, 507 N.E.2d 684, 688 (Mass. 1987); State 
v. Howard, 426 A.2d 457, 462 (N.H. 1981). The constitutional provisions most 
often implicated in cases of this type are the Sixth Amendment right of 
confrontation and the Fourteenth Amendment due process right to a fair trial. See 
State v. Clark, 343 N.W.2d 158, 161 (Iowa 1984). The Constitution requires, 
however, only the introduction of otherwise relevant and admissible evidence. See 
United States v. Nixon, 418 U.S. 683, 711, 94 S. Ct. 3090, 3109 (1974). 
Thus, before evidence of an alleged victim’s sexual behavior may be admitted 
under rule 412(b)(2)(E), the defendant must first establish the relevancy of the 
evidence to a material issue in the case. Tex. 
R. Evid. 401. If the evidence is not relevant, it is not admissible. See 
Tex. R. Evid. 402. To show the 
relevancy of a child victim’s prior sexual conduct as an alternate source of 
sexual knowledge, the defendant must establish that the prior acts clearly 
occurred and that the acts so closely resembled those of the present case that 
they could explain the victim’s knowledge about the sexual matters in 
question. See State v. Pulizzano, 456 N.W.2d 325, 335 (Wis. 1990).
        At 
trial, appellant’s counsel elicited R.D.’s testimony outside the presence of 
the jury and told the trial court that the evidence should come in to show that 
the boys got caught with each other and to get the heat off themselves they 
pointed the finger at appellant. The State objected to the testimony as 
irrelevant and inadmissible under rules 412 and 608(b). Tex. R. Evid. 412, 608(b). The trial 
court conjectured that the door could be opened if an expert testified that the 
boys would not have known about the sexual acts but for appellant’s actions. 
However, without the expert testimony, the trial court stated that the evidence 
was not relevant and that the door was not opened by the testimony as presented. 
Moreover, the trial court surmised that even if the testimony was somewhat 
relevant, it was more prejudicial than probative. See Tex. R. Evid. 403.
        Appellant 
also cites the testimony of Brandon Williams as opening the door to evidence on 
the sexual relationship between J.S. and R.D. During Williams’s conversation 
with appellant where he informed appellant of the allegations of sexual abuse, 
appellant told Williams that one evening while the boys were at his home, he 
heard them making some noise and when he went to investigate he saw the boys 
“messing with each other” or “playing with each other.” Appellant argues 
that this testimony put into issue the question of whether or not J.S. and R.D. 
were in fact “messing with each other.” Appellant contends that the 
testimony left the jury with a misimpression that appellant was lying in order 
to cover himself. We disagree.
        Appellant 
did not establish the relevancy of the evidence as a material issue in the case 
so as to justify admission of evidence of an alleged victim’s sexual behavior 
under rule 412(b)(2)(E). Tex. R. Evid. 
401, 412(b)(2)(E). Appellant did not establish that the prior acts clearly 
occurred, nor did he prove that the acts so closely resembled the acts alleged 
against appellant that they could explain the victims’ knowledge about the 
sexual matters in question. See Matz v. State, 989 S.W.2d 419, 422 (Tex. 
App.—Fort Worth 1999), rev’d on other grounds, 14 S.W.3d 746 (Tex. 
Crim. App. 2000). Thus, we overrule appellant’s second point.
CONCLUSION
        Having 
overruled both of appellant’s points, we affirm the judgments of the trial 
court.
 
  
                                                                  TERRIE 
LIVINGSTON
                                                                  JUSTICE

 
PANEL B:   LIVINGSTON, 
DAUPHINOT, and HOLMAN, JJ.
 
PUBLISH
 
DELIVERED: March 11, 2004