NO. 07-03-0251-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

AUGUST 9, 2005

_____

ERNEST LOPEZ II,

Appellant

v.

THE STATE OF TEXAS,

Appellee
_____

FROM THE 181ST DISTRICT COURT OF POTTER COUNTY;

NO. 44,365-B; HON. JOHN B. BOARD, PRESIDING
_____

***Memorandum Opinion***
_____

Before QUINN, C.J., and REAVIS and CAMPBELL, JJ.

Ernest Lopez, II (appellant) appeals his conviction for aggravated sexual assault of a child. Through four issues, he contends that 1) the evidence is legally and factually insufficient to support the conviction, 2) the trial court erred in continuing with the punishment phase without a defense expert witness thereby violating his "Sixth Amendment right to compulsory process" and 3) trial counsel was ineffective during the punishment phase. We affirm.

### *Background*

The victim in this cause was a six-month-old child, I.V., who was the daughter of Dr. Veronica Vas (Vas).  In August of 2000, appellant's wife (DeAnn) started providing child care for Vas' three children including I.V.  On October 25, 2000, which was a Wednesday, Vas dropped her children off with DeAnn and returned later that evening around 10:00 p.m.  Vas and her children stayed with appellant and his family overnight.  Vas was working at the emergency room in Dumas, Texas, and was working late hours; so, she would return to appellant's house and sleep there until her next shift.

During the evening of the 25th, DeAnn had occasion to change I.V.'s diaper.  She testified that she did not notice anything unusual with the infant's vaginal or anal areas at the time.  Around 3:00 a.m. the next day, DeAnn, appellant, and Vas were awakened by I.V. crying.  The child did not appear to be breathing right and DeAnn tended to her until about 6:00 a.m.  Later that morning, appellant and Vas left to go to work.  Both had to be at their respective jobs by 8:00 a.m.  DeAnn then gathered her own two children and Vas' three children and left for the house of Mary Guerrero (Mary), DeAnn's sister.  After she arrived, DeAnn and her sister left to clean Vas' house.  They were there for approximately four hours.  While at Vas' home, Mary changed I.V.'s diapers and noticed nothing suspicious with the child's vaginal and anal areas.  Later, DeAnn took her sister home and returned to her own home where the children fell asleep.

Around 5:00 p.m., appellant came home.  Vas returned approximately two hours later and went to sleep on the floor with her other two children.  I.V. slept on the loveseat in the same room with her mother.  Prior to going to bed Thursday night, I.V. had required changing and DeAnn did not notice any trauma to the child's genital or anal areas.  The

2

next day, Friday, Vas got up, as did appellant and left for work. DeAnn stayed behind to watch the children. During that day, DeAnn again failed to notice any trauma to the child's vaginal and anal regions. Appellant came home at noon and remained while Vas arrived there around 5:00 p.m.

On Friday at 7 p.m., Vas left for Michigan. Her children stayed in appellant's house. At this time, nothing had alerted either Vas or DeAnn to any problems with I.V. regarding her genitalia or anus. In fact, DeAnn recalled a specific incident around 8:00 p.m. where she changed the baby's diaper and had to thoroughly clean the vaginal and anal area. At that time, no trauma appeared to her. Appellant had left the house around 6:00 p.m. to go to a church function and did not return until 10:00 or 11:00 p.m. When he got home, appellant watched T.V. in the living room until he fell asleep. I.V. was sleeping on a sleeping bag in the living room where appellant slept.

On Saturday morning, October 28th, around 10:00, DeAnn left with two of the children to go shopping. I.V. remained with appellant. DeAnn returned to the house at noon and learned that appellant and I.V. were at the hospital.

On cross-examination, DeAnn represented that when I.V. was brought to her house on Wednesday, October 25th, she noticed unusual looking bumps "all over her head – her face – forehead and a little bit on her head." The bumps were "raised and . . . dark looking." I.V. was also acting lethargic and had a fever. She asked Vas about the bumps, but they did not concern Vas enough to warrant medical attention. So too had she noticed bruises on the infant's chest and a change in the color of the child's stool. It became black in color. Also, the child ate very little from Wednesday until Saturday, slept a lot, and cried when her diaper was changed. DeAnn also represented that I.V. fell off the couch on

3

Friday night and conceded that she lacked the qualifications to give opinion about the existence of trauma to the infant's vaginal and anal regions.

At trial, Joe Neely, an employee with the City of Amarillo Fire Department, testified to receiving a dispatch on Saturday, October 28, 2000, at 11:00 a.m. He was directed to appellant's house. Upon entering the house, Neely found that I.V. was not breathing. His partner, Jeff Greenly, also noticed that the infant's pulse was very weak. Immediately, the pair administered CPR. Within minutes, paramedics arrived and took charge of the situation. Neely, in his assessment of the child, noticed bruising "about [I.V.'s] . . . head, . . . neck, and shoulders and chest. But nothing that – that needed our attention as far as medical treatment."

One of the paramedics, Troy Lightsey (Lightsey), described how appellant told him that I.V. had received several spider bites and was congested. After he had received this information, Lightsey continued to the room where the child was being treated. He testified that he did not see any bites nor was treatment required for any bites or for congestion. However, he saw "some bruising around the upper part of the body and the neck" of the infant. Lightsey also convinced appellant to ride with the child in the ambulance to the hospital. Then, he contacted dispatch to have the police meet them at the hospital. On cross, Lightsey admitted that he did not have a medical opinion regarding the "nature, seriousness, origin or – or age" of the bruises on I.V.'s chest.

Melissa Fanelli, an emergency room nurse trained as a sexual assault nurse, testified that she was on call the morning I.V. arrived at the hospital. Upon the arrival of I.V., she assisted in administering medications to the baby and in placing a catheter into the infant's urinary tract. While attempting the procedure, Fanelli saw "bright red bleeding"

4

inside the vagina which meant the child had been sexually assaulted. The police were notified of this. Fanelli also testified that this type of injury could not have been done by the baby, by any medical condition, or by cleaning the child with pre-moistened wipes or a wash cloth. Nor could the injuries have been caused accidentally given their severity. In her opinion, they were the result of forceful penetration.

Becky O'Neal, who was originally assigned as the primary care nurse for I.V., also saw the fresh bleeding and commented that "to see fresh blood trickling out of a six-month-old was very significant to me." So too did she state: ". . . I did see some trauma to her posterior fourchetta at that time, which to me, means that something – some kind of forceful penetration has taken place, so we back out of the picture and turn it over to the Sexual Assault Nurse Examiner."

In turn, the sexual assault nurse examiner opined, much like Lightsey, that the injuries suffered by I.V. were due to forceful penetration by an object and that the bruising and abrasions had occurred within the last 24 hours. So too did she say that the bleeding had been caused by injuries that occurred approximately 30 minutes prior to the child's arrival in the emergency room and that they were consistent with those from the sexual penetration of the female organ.

Next, Officer Justin Taylor testified about his communication with appellant at the hospital. Appellant told him that after DeAnn left the house, he went to change I.V. and later decided to give her a bath. He turned away for a few minutes to clear off a space to wash the child and when he turned back he noticed the baby had stopped breathing. He gently patted I.V. on the bottom, turned her over and slapped her on the face, and panicked and started shaking the infant. Appellant then took I.V. to another room and laid her on the

5

bed, began CPR, and phoned 911. The officer was also informed by appellant about how the child's discharge was sticky and rank the night before and that he was unable to clean the baby completely. The officer also related how appellant told him that 1) appellant and DeAnn noticed "marks around [the child's] face, neck and chest area," and was told that these were spider bites that were healing and 2) the child had been having problems breathing and that they had given her breathing treatments. According to the officer, appellant showed proper concern for the infant and was cooperative. Furthermore, in his report, Taylor had indicated that he had spoken to the sexual assault nurse about the child's injuries and that they were purportedly moderate to the vaginal area and minor to the anal area.

In testifying, Detective Donald Moore related his conversation with appellant. According to the officer, appellant appeared to be uttering "defensive statements to medical reasons why the baby had had difficulty." So too did appellant appear scared and upset and commented that "maybe [he] shook the baby too hard." Unlike what he told another officer, however, appellant told Moore that he had decided to change the baby when he noticed "a spot" on her nightie. He also "noticed some strange colored spots on the diaper" and cleaned her "real well" with baby wipes. The areas cleaned included "her creases and the private areas." Appellant then purportedly left I.V. in the crib for about ten minutes. When he returned, he picked the child up and "noticed she was real limp and . . . her eyes were dilated." Appellant then stated that he shook her but failed to get a response; he also shook her legs and again obtained no response. He then "picked her up and slapped her cheeks to try to get her to respond" and took her to the bathtub to run water over her. The child continued to evince no response, according to appellant. And, as he walked with her

6

to a bedroom, he "shook her some more." Upon arriving in the bedroom, appellant described how he laid her on the bed and listened to her heart beat. It was purportedly fast, and the infant was not breathing. He then began CPR and noticed air and mucous come out of her mouth and nose. Though appellant said that he was able to clear her airways, she "wasn't any better." So, he eventually called 911.

Garon Foster, a DNA technical leader with the Bexar County Criminal Investigation Laboratory in San Antonio, Texas, testified that the lab had received items of evidence from appellant and I.V. The items consisted of soiled diapers, a pair of appellant's underwear, a pair of his shorts and a T-shirt. A small amount of human blood was found on one of the diapers. Skin cells were found in the underwear. Erin Reat, another forensic scientist in the San Antonio lab testified that he conducted DNA analysis on the cells from the underwear. He tested three different cuttings from appellant's underwear. One cutting held DNA material matching that of appellant. Another had DNA material matching that of appellant and I.V., while the third held DNA material of an unknown male.

Next, Dr. Eric Levy, a pediatric critical care physician, testified that I.V.'s "genital perineal and rectal areas - - that whole area – had been traumatized" and that the injuries were "serious – and violent for there was, in [his] opinion, extensive bruising [a]nd . . . significant tearing of the posterior vaginal wall." He also opined that the injuries occurred within an hour before I.V. arrived at the hospital and that they could not have been caused by cleaning the baby during a diaper change or by the baby being dropped on this area.

The defense recalled DeAnn to testify. Whiled being questioned, she said that due to the bruising on the baby's chest, Vas did not take I.V. to the doctor's the night the baby awoke crying and with a fever. Vas purportedly "didn't want anybody to think she was

7

abusing her child."  So too did she state that Vas spent very little time with I.V. and that when I.V. arrived on Wednesday evening and during her stay with them, the child lacked energy, slept a lot and was listless.

### *Issues One and Two - Sufficiency of the Evidence*

In his first two issues, appellant contends that the evidence is legally and factually insufficient to support his conviction.  This is so because it did not establish that he intentionally or knowingly assaulted the child.  We disagree and overrule both issues.

The standards by which we review legal and factual sufficiency challenges are well established.  We refer the parties to *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), *Sims v. State*, 99 S.W.3d 600 (Tex. Crim. App. 2003), *Zuliani v. State*, 97 S.W.3d 589 (Tex. Crim. App. 2003), and *King v. State*, 29 S.W.3d 556 ( Tex. Crim. App. 2000) for their explanation.

Next, to secure a conviction for aggravated sexual assault, the State must prove beyond reasonable doubt that the accused 1) intentionally or knowingly, 2) caused the penetration of the anus or female organ of a child under 17 by any means, or 3) caused the sexual organ of a child to contact the mouth of another person, including the accused.  TEX. PENAL CODE ANN. §22.021(A)(1)(B)(I) & (iii) (Vernon 2003).

Here, the evidence illustrated that 1) neither Vas nor DeAnn saw any trauma to either the child's genital or anal areas prior to the child being left with appellant on October 28th, 2) I.V. was left in the sole care of appellant on the 28th,  3) appellant admitted that he was the only person with I.V. the morning she arrived at the hospital, 4) the child was seen bleeding at the hospital from her vaginal area and in a manner indicative of a sexual assault, 5) the injury could not have been caused by the baby, any medical condition, or

8

cleaning with a pre-moistened cloth or wash cloth, 6) the injuries were caused by "forceful penetration," 7) the blood "trickling out of a six-month-old was very significant," 8) the injuries occurred approximately "thirty minutes" prior to I.V. arriving at the emergency room and during a time wherein the child was within the exclusive care of appellant, 9) appellant's explanations about the injuries were inconsistent with the nature of her injuries, and 10) DNA evidence from I.V. was found in appellant's underwear. This is some evidence upon which a rational jury could conclude beyond reasonable doubt that appellant intentionally or knowingly caused the penetration of the infant's vagina. Thus, the evidence is legally sufficient to support the conviction.

As for the claim of factual insufficiency, we note that the record held evidence of the following: 1) though no one had noticed bleeding from I.V. when caring for the child, they had not observed her as closely as did the nurses at the hospital, 2) the State's DNA expert agreed that there could be a transfer of DNA material between the child and the child's care giver as a matter of course, 3) Vas stated that she did not want to take I.V. to the doctor because she was afraid of being accused of child abuse, 4) I.V. was listless and slept a lot from the time she arrived at appellant's home until her arrival at the hospital, 5) I.V. had a fever, very little appetite and her feces changed to a dark color when brought to appellant's home, 6) when I.V. arrived at appellant's on Wednesday she had bumps all over her head and chest which appellant said were caused by spiders and 7) appellant noticed bruises on I.V.'s chest. Though this evidence suggests that the infant suffered from some trauma or illness prior to the time she was left with appellant, it does not explain the extensive injury to her vaginal region occurring the 28th and while in the exclusive care of appellant. Nor does it explain the inconsistencies in appellant's version of events. At best, it created

9

fact issues for the jury to decide. And, we cannot say that the ultimate decision of the jury was contradicted by overwhelming evidence, lacked evidentiary support or was otherwise clearly wrong or manifestly unjust.

### Issue Three - Expert Witness

In his third issue, appellant contends that the trial court erred in continuing with the punishment hearing without appellant's expert witness being present. This purportedly denied him his "Sixth Amendment right to compulsory process." We overrule the issue.

To obtain a continuance because of a missing witness, the defendant must show, among other things, he exercised due diligence to secure the witness' attendance. TEX. CODE CRIM. PROC. ANN. art. 29.06(2) (Vernon 2003). "If a defendant does not apply for process of a witness until a day or two before his trial, he has failed to exercise the due diligence which is necessary to support a motion for continuance." *Peoples v. State*, 477 S.W.2d 889, 891 (Tex. Crim. App.1972); *see also Norton v. State*, 564 S.W.2d 714, 716-17 (Tex. Crim. App.1978). In the case at bar, appellant failed to subpoena the expert witness prior to trial. Nor did he accept the trial court's offer to grant a continuance and issue a capias to secure the witness' attendance. Given this, we cannot say that the trial court denied appellant his right to compulsory process.

### Issue Four - Ineffective Assistance of Counsel at Punishment

In his final issue, appellant contends that trial counsel was ineffective during the punishment phase of the trial. This was allegedly so because he failed to stay in close contact with the expert witness and, thereby, failed to secure his presence at trial. We overrule the issue.

10

A claim of ineffective assistance of counsel during the punishment phase is reviewed under the standard set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003), and *Hernandez v. State,* 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986). Accordingly, a defendant must establish that (1) counsel's performance was deficient (*i.e.* fell below an objective standard of reasonableness), and (2) there was a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Rylander v. State*, 101 S.W.3d at 110; *see also Hernandez v. State*, 726 S.W. 2d at 55. In other words, appellant must demonstrate that the deficient performance prejudiced him. *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002). Additionally, the failure to establish either prong of the test results in the denial of the claim. *Garcia v. State*, 887 S.W.2d 862, 880 (Tex. Crim. App. 1994).

Here, the motion for new trial filed by appellant said nothing about his trial counsel's effectiveness. Therefore, no record was developed regarding trial counsel's strategy or the nature or substance of the absent witness' testimony. This is problematic since the failure to call a witness does not constitute ineffective assistance without a showing that the witness was available and his testimony would have benefitted the defendant. *Butler v. State,* 716 S.W.2d 48, 55 (Tex. Crim. App. 1986); *Johnston v. State*, 959 S.W.2d 230, 236 (Tex. App.–Dallas 1997, no pet.). Therefore, based on the record before us, we cannot say that counsel's performance was deficient or that appellant was harmed, assuming that counsel did act unreasonably.

Accordingly, we affirm the judgment of the trial court.

Per Curiam

Do not publish.

_____